**GRACE v. ORKIN EXTERMINATING
CO., Inc.**

No. 4840.

Court of Civil Appeals of Texas. Beaumont.
Jan. 14, 1953.

Rehearing Denied Feb. 11, 1953.

Benckenstein, Wells & Duncan, Beaumont, for appellant.

Orgain, Bell & Tucker, Beaumont, for appellee.

WALKER, Justice.

The appellee, Orkin Exterminating Company, was formerly the employer of the appellant Grace, and brought this suit to restrain Grace's violation of certain restrictive covenants in the contract of employment. Orkin is referred to hereinafter as plaintiff, and Grace as defendant.

The contract was in writing. It was dated July 15, 1949, although it seems to have been executed by the parties some weeks after this date. The relevant parts are:

"State of Texas
County of Orange

"This agreement made and entered into this the 15th day of July, 1949, by and between Orkin Exterminating Co., Inc., maintaining its principal office and place of business in the State of Louisiana, County of Orleans, as party of the First Part, hereinafter referred to as the 'Company', and Harold Grace of the State of Texas, County of Orange, as Party of the Second Part, hereinafter referred to as the 'Employee'.

"Whereas, the company is engaged in the exterminating, fumigating and termite control business, being a business that requires secrecy in connection with its methods and systems employed by it in eradicating and controlling rats, mice, roaches, bugs, vermin, termites, beetles and other insects; and

"Whereas, for the proper protection of the business of the Company it is absolutely necessary and essential that all matters connected with and arising out of or pertaining to the Company's business and the Company's methods, and the names of the Company's customers be kept secret; and

"Whereas, the territory hereinafter set forth in Paragraphs 6 and 7 has been solicited by the Company through its sales representatives and through advertising mediums and a large, valuable and extensive trade has been established and maintained at a great expense to the said Company; and

"Whereas, the said Company has a substantial amount of customers in the said territory hereinafter set forth in paragraphs 6 and 7 and the names of said customers are within the exclusive knowledge of the Company and are of great value to the Company; and,

"Whereas, the undersigned Employee, Party of the Second Part, desires to enter into the employ of said Company; and

"Whereas, a great loss and damage will be suffered and sustained by the said Company if, during the term of this contract or for a period of two (2) years immediately following the termination of this contract, the said employee should for himself, or in behalf of, or in conjunction with any other person, persons, firm, company, partnership or corporation, call upon, solicit, sell, or endeavor to sell or solicit any customer or customers of the said Company, or use any of the methods and systems now employed by the Company in eradicating and/or controlling rats, mice, roaches, bugs, vermin, termites, beetles and other insects within the territory hereinafter set forth in Paragraphs 6 and 7 or any and all other things and products incidental to the business of the Company, or solicit, divert, or take away any such customers or the business or the patronage of the said Company during the aforesaid time, for which damage and loss by reason of his financial conditions and circumstances the said Employee could not be compelled by law to respond in damages in any action at law.

"Now, Therefore, the said parties hereto, for and in consideration of the premises and the mutual covenants and agreements hereinafter contained, and by them respectively to be kept and performed, covenant and agree as follows:

"1. The said Company agrees to employ and does by these presents employ Harold Grace as Manager, Beaumont, Texas and hereby agrees to pay or have paid to the said employee the sum of Two Hundred Dollars ($200.00) per month, plus a commission of 5% of deposits received through the Beaumont, Texas office of the Company from Pest Control and Termite Control accounts serviced out of the Beaumont office. (See Paragraph No. 11) or at such wages, salary or commission as may hereinafter or from time to time be agreed upon.

"* * * 5. Said Employee hereby expressly covenants and agrees, which covenant and agreement is of the essence of this contract, that, at no time during the term of this agreement or for a period of two (2) years immediately following the termination of this employment, (Regardless of whether said termination of this employment is voluntary or involuntary), will he for himself, or in behalf of any other person, persons, firm, partnership, company or corporation call upon any customer or customers of the said Company for the purpose of soliciting and/or selling to any of the said customers, any exterminating, fumigating or termite control service for the purpose of eradicating rats, mice, roaches, bugs, vermin, termites, beetles and other insects; nor will he in any way, directly or indirectly, for himself or in behalf of, or in conjunction with any other person, persons, firm, partnership, company or corporation, solicit, divert or take away any such customers of the said Company during the term of this employment, or for two (2) years immediately following the termination of this agreement.

"6. Said Employee further covenants and agrees that at no time during the term of this employment, or for two (2) years immediately following termination of this employment, (regardless of whether such termination is voluntary or involuntary) will he for himself, or in behalf of any other persons, partnerships, corporation or company, engage in the pest control business or any business engaged in the eradication and control of rats, mice, roaches, bugs, vermin, termites, beetles and other insects within the territory known as cities of Beaumont, Port Arthur and Orange, Texas, and Lake Charles, La., and a radius of 25 miles of each of said cities, nor will he directly or indirectly for himself, or in behalf of or in conjunction with any other person, persons, partnerships, corporation or company, solicit or at-

tempt to solicit the business or patronage of any person, persons, firm, corporation, company or partnership within the said territory for the purpose of selling a service for the eradication and/or control of rats, mice, roaches, bugs, vermin, termites, beetles and other insects, and such other incidental business and service now engaged in by the company, nor will the said Employee disclose to any person, whatsoever, any of the secrets, methods or systems used by the Company in and about its business.

"7. Said Employee further covenants and agrees that he will not, during the term of this employment nor for two (2) years immediately following the termination of this employment (regardless of whether said termination of this said employment is voluntary or involuntary) service contracts and accounts and/or work in the territory known as cities of Beaumont, Port Arthur and Orange, Texas and Lake Charles, La. and a radius of 25 miles of each of said cities, for himself, or for any other person, persons, firm, company, partnership, or corporation directly or indirectly, or in conjunction with any other person, persons, firm, company, partnership, or corporation, selling any kind of pest control service, or any service, items or products for the exterminating and/or control of rats, mice, roaches, bugs, vermin, termites, beetles, and other insects, and/or any other things, items and products now handled by or from time to time handled by the said Company or any products incidental to the business of the Company.

"8. It is mutually agreed and understood that the term of employment shall be for a period of not less than Three months after this date, provided the Employee faithfully performs his duties in a manner in keeping with this agreement and the rules and regulations of the employer, after which time the said employment may be terminated by either party upon the giving of Fifteen days notice to the other * * *.

"11. It is agreed and understood that employee shall receive a minimum compensation of $300.00 per month.

"In witness whereof, the parties hereto have hereunto set their hands and affixed their seals on this the day and year first above written.

Attest:

/s/ Theodore Oser
Theodore Oser Secretary
/s/ Robert E. Couhig
Witness
/s/ Mrs. L. Ryan
Witness

Orkin Exterminating Co., Inc.
 Company
/s/ Otto Orkin (Seal)
 Otto Orkin President
/s/ Harold Grace (Seal)
 Harold Grace Employee".

The plaintiff is engaged in the business of destroying insects and animal pests which damage property. Prior to the date of the contract from which we have quoted, the defendant had established a small business in Beaumont, Texas, which seems to have extended to Port Arthur, Texas, and which was managed by an employee of plaintiff's named Shank. This man wanted to leave this post and Couhig, who was Shank's superior officer and defendant's, too, suggested to the defendant that he take Shank's place. Couhig's office was, and still is, in New Orleans, Louisiana, and the defendant was then employed by plaintiff in New Orleans, and he resided there. Couhig was then and still is the manager of plaintiff's business in an area referred to in the proof as the New Orleans District. Plaintiff eventually accepted Couhig's suggestion and came to Beaumont, Texas and established his residence there; and he worked for

plaintiff under the contract, performing the duties required of him, in the places named in that contract (and in other places) until his employment ended in November, 1951. During this period of time the defendant's services were satisfactory to the plaintiff but in October, 1951, the defendant requested an increase in pay which the plaintiff declined to grant and, acting through Couhig, elected to treat as a resignation certain statements made by defendant in letters written by him to Orkin, who was the president of the plaintiff corporation. The defendant seems to regard November 15th as the date on which his employment ended, and we note that the injunction granted by the trial court runs from that date. The circumstances attending the termination of the plaintiff's employment are not material to any issue raised on this appeal.

During the latter part of November, 1951, after having been notified that his employment was terminated, the defendant caused a corporation to be organized under the laws of Texas, which is styled "Grace Exterminating Company", and he became a stockholder in, and the president of this corporation. The Grace Exterminating Company engages in the same business in which defendant engages and competes with the plaintiff in Beaumont, Port Arthur and Orange, Texas and in adjacent areas; and since this is done through the defendant, this conduct violated the restrictive covenants which have been quoted, and the defendant intended to continue this violation.

The plaintiff prayed for an injunction restraining the defendant from violating these restrictive covenants. The cause was tried to the court with a jury. The trial court instructed the jury to render a verdict for plaintiff on the prayer for injunction (plaintiff abandoned a claim for damages), and the trial court rendered judgment enjoining the defendant from violating the covenants contained in paragraphs 6 and 7 for a period of 2 years from November 15, 1951, "within the cities of Beaumont and Port Arthur, Jefferson County, Texas, and Orange, in Orange County, Texas, and within a radius of twenty-five (25) miles in the State of Texas from the county courthouse or sub-courthouse of each of said cities". The operation of the injunction was limited to Texas; the defendant was not restrained from engaging in business in Louisiana. To this part of the judgment the defendant has assigned the five points of error discussed hereinafter. The defendant filed a cross-action for commissions which he alleged had been earned by him but had not been paid to him, but the trial court denied the defendant a recovery on this cross-action, and no error has been assigned by the defendant to this part of the judgment.

## Opinion

Defendant has assigned five points of error for reversal and these will be discussed in an order different from that in which the Defendant has presented them. Additional findings of fact have been filed separately, but our judgment is based upon these as well as such statements of fact as are made in this opinion.

## Point 3

This point assigns as error that the issue of fact was raised, whether "the contract in question imposed any greater restraint then is reasonably necessary to procure protection of the business of plaintiff or the goodwill thereof".

Point 3 is overruled on the following grounds:

■ (1) The restrictive covenants are in restraint of trade and are valid only if shown to be within exceptions to the general rule. See: Wissman v. Boucher, Tex. Sup., 240 S.W.2d 278; Super Maid Cook-Ware Corporation v. Hamil, 5 Cir., 50 F.2d 830, and other decisions cited herein. For general discussions see: Chapter XLVIII of Williston's 1937 Ed., entitled: "Illegal Bargains: Contracts in Restraint of Trade." See, also, Restatement, Contracts, Sec. 516(f). A valuable collection of authorities has been made in Arthur Murray Dance Studio v. Witter, Ohio Com.Pl., 105 N.E.2d 685.

The burden of proof is on the former master to bring the covenant within an exception which will support it. City Ice

Delivery Co. v. Evans, Tex.Civ.App., 275 S.W. 87; Carpenter v. Southern Properties, Inc., Tex.Civ.App., 299 S.W. 440; Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, 138 N.E. 485.

Covenants in favor of the former employer, restricting competition by a former employee after the employment has terminated, which lasted for a reasonable time and which operated over a reasonable area, have been specifically enforced by injunction in cases where the goodwill of the employer's customers had attached to the employee during the latter's employment and the employee thus had acquired during his employment a special influence with the customer which gave him an advantage over the employer in competition for the customer's business. Patterson v. Crabb, Tex.Civ.App., 51 S.W. 870; City Ice Delivery Co. v. Evans, Tex.Civ.App., 275 S.W. 87; Parisian Live Dyers & Cleaners v. Springfield, Tex.Civ.App., 275 S.W. 1098; Jennings v. Shepherd Laundries Co., Tex. Civ.App., 276 S.W. 726; Bettinger v. North Ft. Worth Ice Co., Tex.Civ.App., 278 S.W. 466; Texas Ice & Cold Storage Co. v. McGoldrick, Tex.Civ.App., 284 S.W. 615; Carpenter v. Southern Properties, Inc., Tex.Civ.App., 299 S.W. 440; Martin v. Hawley, Tex.Civ.App., 50 S.W.2d 1105; McAnally v. Person, Tex.Civ.App., 57 S.W. 2d 945; Blaser v. Linen Service Corp., Tex.Civ.App., 135 S.W.2d 509; Houston Credit Sales Co. v. English, Tex.Civ.App., 139 S.W.2d 163.

Similar covenants have been upheld which restricted the former employee's use of that sort of information imparted to him in confidence by the employer which is called trade secrets or business secrets and which concern formulae, methods and other facts used in the business. See: Williston, Secs. 1643 and 1646, 1937 Ed., and see: Sanitary Appliance Co. v. French, Tex. Civ.App., 58 S.W.2d 159; Texas Ice & Cold Stg. Co. v. McGoldrick, Tex.Civ. App., 284 S.W. 615, at page 617; Blaser v. Linen Service Corp., Tex.Civ.App., 135 S. W.2d 509. Also see: Glass v. Kottwitz, Tex.Civ.App., 297 S.W. 573; McCall v. Wright, 198 N.Y. 143, 91 N.E. 516, 31 L.R. A.,N.S., 249; Magnolia Metal Co. v. Price,

65 App.Div. 276, 72 N.Y.S. 792; Kaumograph Co. v. Stampograph Co., 235 N.Y. 1, 138 N.E. 485; Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 160 N.E. 708; Ideal Laundry Co. v. Gugliemone, 107 N.J. Eq. 108, 151 A. 617; Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J.Eq. 99, 46 A.2d 201; A. Hollander & Son v. Imperial Fur Blending Corp., 2 N.J. 235, 66 A.2d 319; Thomas W. Briggs Co. v. Mason, 217 Ky. 269, 289 S.W. 295, 52 A.L.R. 1344; Club Aluminum Co. v. Young, 263 Mass. 223, 120 N.E. 804; May v. Young, 125 Conn. 1, 2 A.2d 385. Information about customers of the employer may or may not be such a secret. See Williston, Sec. 1646, p. 4624, 1937 Ed. and compare Ridley v. Kraut, 63 Wyo. 252, 180 P.2d 124 and Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 140 N.E. 708 with McCall v. Wright, 198 N.Y. 143, 91 N.E. 516; Magnolia Metal Co. v. Price, 65 App.Div. 276, 72 N.Y.S. 792; Glass v. Kottwitz, Tex. Civ.App., 297 S.W. 573; Burroughs Adding Machine Co. v. Chollar, Tex.Civ.App., 79 S.W.2d 344; Blaser v. Linen Service Corp., Tex.Civ.App., 135 S.W.2d 509.

Obviously, that is not the employer's secret which is known to his competitors or is available to them as members of the public without resort to the employer. Wissman v. Boucher, Tex.Sup., 240 S.W.2d 278; Ridley v. Kraut, 63 Wyo. 252, 180 P. 2d 124; Kaumagraph Co. v. Stampograph Co., 235 N.Y. 1, 138 N.E. 485; Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 140 N.E. 708; National Starch Products Co. v. Polymer Industries, 273 App.Div. 732, 79 N.Y.S.2d 357; Club Aluminum Co. v. Young, 263 Mass. 223, 160 N.E. 804; Super-Maid Cookware Corp. v. Hamil, 5 Cir., 50 F.2d 830. Of this sort seem to be the Courts of Civil Appeals' decisions in Miller v. Chicago Portrait Co., 195 S.W. 619; Byers v. Trans-Pecos Abst. Co., 18 S.W.2d 1096 and the holding in May v. Lee, 28 S.W.2d 202 that an injunction was unnecessary to protect the employer.

A trade secret has sometimes been defined as something known only to the owner and those employees of his to whom it is necessary that it be confided. See Ridley v. Kraut, 63 Wyo. 252, 180 P.2d 124; Ar-

thur Murray Dance Studios v. Witter, Ohio Com.Pl., 105 N.E.2d 685, p. 709, 6 T.L.R. 502. But it seems unnecessary to make so strict a definition where the employer is attempting to keep the secret and the information is still unavailable to the trade, and it has been so held. Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J.Eq. 99, 46 A.2d 201; and note the comments in Kaumagraph Co. v. Stampograph Co., 235 N.Y. 1, 138 N.E. 485, at page 487. We refer to the matter because the defendant while manager of the plaintiff's office in Beaumont delivered confidential bulletins to his secretary. These bulletins contained information about methods and substances used in the plaintiff's business and about other matters incidental to these. The defendant was furnished these bulletins by the plaintiff's technical department. He was first instructed to keep them to himself and he did so. He was next instructed to make them availabe to his servicemen and he did so by delivering them to his secretary. Whether the secretary read them the proof does not show, but there is no evidence that anyone disclosed the information to the public or that the defendant made the information available to any other persons. The defendant's testimony shows that he regarded and treated these bulletins as confidential communications. These circumstances do not show that the confidential bulletins ceased to be confidential or secret nor was an issue of fact concerning secrecy raised thereby.

The secret may be only an improvement of something known to the trade. Ideal Laundry v. Gugliemone, 107 N.J.Eq. 108, 151 A. 617. Language in the opinions suggest that a secret must be distinctive or unusual; but the real question is secrecy, although the fact that the so-called secret is discoverable by any person who may give his attention to the problem to be solved may have some bearing on the issue of secrecy.

The burden of proof is on the former employer to show that the former employee acquired from him a secret, as appears from decisions hereinbefore cited; but so far as secrecy itself is concerned such proof must inevitably be conjectural, at least in part. For a competitor who has learned a valuable secret for himself is no more apt to discover it to the public than is a plaintiff suing a former employee. Yet without acknowledgment by all of their entire budget of trade practices and special information a court cannot be wholly sure that a plaintiff's claim of secrecy is correct. The element of secrecy is not susceptible of exact proof, at least in some cases, and the court's decision in such case will have to be determined by probabilities.

A covenant by a former employee not to compete with the employer after the termination of the employment may be enforced by injunction to prevent the employee's misuse of secrets imparted to him by the employer, although the covenant itself does not refer to secrets. That is, proof that the secrets will be used by the employee in competition against the master affords support for an injunction specifically enforcing the employee's covenant not to compete. See decisions hereinbefore cited. This is ordinarily the only way that use of the secret by the former employee can be prevented.

It is not a ground for enforcing the covenant by injunction that the former employee was trained by the employer. Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 140 N.E. 708; Thos. W. Briggs Co. v. Mason, 217 Ky. 269, 289 S.W. 295, 52 A.L.R. 1344; Club Aluminum Co. v. Young, 263 Mass. 223, 160 N.E. 804. We refer to this rule because all of the training the defendant has had in the business in which he was engaged was given him by the plaintiff; and this training was complex and extensive and included much technical information. All of the defendant's experience in the business, except during the time since he left plaintiff's employment, was also received while he worked for the plaintiff. We have noted Williston's qualification of this rule of decision where the training was given in consideration of the covenant. See: Williston, Sec. 1646, pp. 4627, 4628, 1937 Ed. This qualification is not involved in this case.

In cases where the employee's covenant was enforced by injunction because of his special influence with the employer's

customers it has been said that the restriction imposed by the covenant must be reasonable in duration and in area covered. And where the area covered was excessive but the covenant was divisible as to area, the injunction has been limited to the area to which it might be said that the employee's special influence was confined. See: City Ice Delivery Co. v. Evans; Tex. Civ.App., 275 S.W. 87; Bettinger v. North Ft. Worth Ice Co., Tex.Civ.App., 278 S.W. 466. See, also: Fleckenstein Bros. Co. v. Fleckenstein, 76 N.J.L. 613, 71 A. 265, 24 L.R.A.,N.S., 913. The holding made in McAnally v. Person, Tex.Civ.App., 57 S.W. 2d 945 at page 950 (No. 10) goes beyond these cases. There the Court of Civil Appeals held that the injunction would be limited to that part of a unitary area within which the facts showed covenantee to be entitled to protection; and the Court of Civil Appeals seems to have done the same thing in Burroughs Adding Machine Co. v. Chollar, 79 S.W.2d 344. The holding made in Martin v. Hawley, Tex.Civ.App., 50 S.W.2d 1105 seems inconsistent with these last two decisions. There is a difference of opinion concerning the necessity for severability in form or in thought to authorize a limited injunction, and the matter is discussed in Williston, Sections 1659 and 1660, 1937 Ed. We agree with the holdings made in McAnally v. Person and Burroughs Adding Machine Co. v. Chollar. This conclusion is material because of the division which the injunction has made in the operation of defendant Grace's restrictive covenants. This injunction is limited to Texas and thus excludes from the operation of the covenants Lake Charles and the 25 mile area adjacent thereto and it also excludes that part of the 25 mile areas adjacent to Orange and Port Arthur which is in Louisiana. We assume solely for the purposes of decision that the restrictive covenants are not enforcible in Louisiana, because of the prohibition made in the statutes hereinafter quoted. But if the court can issue an injunction limited to that part of a unitary area for which the common law rule of decision authorized the parties to contract, there is no reason why the court cannot issue the injunction for that part of a unitary area not denied them by statute, unless the parties intended otherwise. We have discussed this matter of severability in our discussion of Point 1 and have there construed the proof as showing that the parties intended a severance if that was necessary to give effect to their agreement.

It is only here that divisibility in area is material on this appeal for the proof shows as a matter of law that the parties are engaged in the same business within the area covered by the injunction. As for the defendant, he testified:

"Q. But my question is, you are doing business within the area of 25 miles of Beaumont aren't you? A. Yes.

"Q. And in Beaumont. A. In Beaumont, yes.

"Q. You are now doing business in Port Arthur and within the area of 25 miles surrounding Port Arthur? A. That's right.

"Q. You are doing business in Orange at the present time? A. That's right.

"Q. And within the area of 25 miles from Orange? A. That's right."

The matter of reasonableness may involve the question whether the injunction operates upon so many people as to prevent ordinary competition rather than to protect the interest claimed by the plaintiff employer. See: Carpenter v. Southern Properties, Inc., Tex.Civ.App., 299 S.W. 440; Southern Properties, Inc. v. Carpenter, Tex.Civ.App., 21 S.W.2d 372. This question may be one of fact.

These rules of decision we think to be applicable if the validity of the covenants is to be determined by the law of Texas; and under Point 1, we hold hereinafter that the law of Texas is applicable.

■ (2) Defendant Grace's contract with plaintiff contains three restrictive covenants. These are in paragraphs numbered 5, 6 and 7. The injunction granted enforces only the last 2, those in paragraphs 6 and 7.

The covenant in paragraph 5 prohibited the defendant from soliciting customers of the plaintiff's for two years after his em-

ployment ended. This has been abandoned by the plaintiff as a separate ground of relief and the judgment does not depend upon it.

The covenant in paragraph 6 prohibits the defendant for two years after his employment ends, from engaging in the business within a designated area, and in this covenant defendant also promised that he "would not disclose to any person whatsoever any of the secrets, methods or systems used by (plaintiff) in and about its business."

In the covenant in paragraph 7, the defendant promised that for two years after his employment ended he would not "service contracts and accounts and/or work" in the same area designated in paragraph 6, selling services or products like those furnished by the plaintiff.

The injunction specifically enforced these last two covenants within that part of the contract area (namely, the cities of Beaumont, Port Arthur and Orange, and the 25 mile radius adjacent to each), which is in Texas.

Whether the evidence supports the instructed verdict on which the injunction depends must be determined first, from the proof concerning the attachment to defendant Grace of the goodwill of plaintiff's business and customers and next, from the proof concerning business secrets.

The evidence very strongly indicates, if it does not show as a matter of law, that an injunction was unnecessary to protect the plaintiff from the exercise of any special influence or from the use of plaintiff's goodwill within the territory covered by the injunction, and that so far as the matter of goodwill and special influence is concerned the plaintiff should have been denied the injunction because it would only have prevented the sort of competition the plaintiff had to meet from the trade. The defendant was interrogated about 69 persons and firms who had been plaintiff's customers while defendant was working for plaintiff under the contract, and most, if not all, of these must have become plaintiff's customers as a result of defendant's own efforts. Of the 69, the defendant had

captured 12, and at the time of trial he still had 9 of them. These customers, of course, were the customers of Grace Exterminating Company, but the defendant operated this company and it is accurate enough to refer to these customers as being defendant's instead of the corporation's. The defendant had solicited, but had failed to capture 38 of the 69. He had not solicited 12 and he did not recall whether he had solicited 7. He testified that he had tried to see all prospective customers. In addition to the 9 former customers of the plaintiff's, the defendant had acquired 10 others, making a total of 19 persons and firms who used his services regularly. These customers paid his concern a monthly total of $237, of which the plaintiff's former customers paid $160. So far as customers who used the services of an exterminator regularly is concerned, this represented the result of defendant's efforts to compete with plaintiff during the period from November 15, 1951, when his employment ended, to March 10, 1952, when the trial of the cause began, a few days less than four months; and not all of the 19 customers were in the area covered by the injunction.

During this same period of time, the plaintiff, working through a new manager who had only been stationed in Beaumont since the defendant left the plaintiff's employ (although he had come there from New Orleans from time to time to assist and supervise work done in the eradication of termites) acquired more new customers within the area covered by the injunction than the defendant had acquired, although the income from those who used regular service was less than that paid the defendant by similar customers of his.

The proof also showed that the plaintiff's business was not large (the staff of employees was small and the office had never been profitable) and that defendant's business was much smaller; and it was in proof that more than 234,000 people reside in Orange and Jefferson counties of Texas. The proof does not show how many of these people resided within the area covered by the injunction, but evidently most of them did. The fact that the contract names Beaumont, Port Arthur and Orange indi-

cates that these are the principal cities of this area. Nor does the proof show how many industrial concerns, of the sort who would need continuous service like that furnished by plaintiff and defendant, are in these two counties or the area covered by the injunction. However, it is also reasonable to assume that many potential customers of this sort are in this area, and when account is taken of the statement in Couhig's pretrial deposition (Couhig had been the defendant's superior officer and was the head of the plaintiff's New Orleans district) that "my personal thought is that there is plenty of business for everyone to have in this particular field," the situation approaches that in Southern Properties, Inc. v. Carpenter, 21 S.W.2d 372, where the Court of Civil Appeals thought that the issue of necessity was for the jury to decide. Seemingly, the great majority of potential customers of all classes were numerous within the area covered by the injunction and were not controlled by the plaintiff or by the defendant; and seemingly the injunction would have accomplished more toward the restriction of competition than toward the protection of the plaintiff's goodwill and prevention of the defendant's misuse of that goodwill or of any special influence defendant had over plaintiff's customers. We are not satisfied that the evidence actually raised an issue of fact regarding the necessity of the injunction to protect the plaintiff's lawful interest; but, the evidence certainly went no farther. Most of the goodwill and special influence which the defendant could have misused for his own benefit seems to have had its effect before this cause came to trial.

The defendant did have information about the plaintiff's customers, such as the price paid by them, and it was valuable to him and he made use of it. Thus of the 9 captured customers he still had at the time of trial one paid the defendant a slightly lower fee than the plaintiff had been paid. The other 8 paid defendant the same fee paid the plaintiff, but the defendant said that he knew what the service was worth. However, we infer that the effect of this information was very largely exhausted before the case was tried. The identity of most of the plaintiff's customers was not a secret; for they were of the commercial sort whom plaintiff's competitors would ordinarily solicit as a matter of course. And when this solicitation was made the customer would ordinarily give the solicitor full information about his requirements if he were thinking of terminating the plaintiff's services; so that here, too, there is not much room for a claim of special and secret information about the customer. There is not enough evidence concerning such information to support, as a matter of law, either the injunction prohibiting competition within the broad and populous area covered by the judgment or an injunction limited to plaintiff's customers.

(3) However, we think that the instructed verdict, and the injunction resulting, can be supported by the evidence concerning business secrets.

This evidence has been summarized, and discussed, in our findings. Briefly, it shows that while basic information is available which would enable one to engage in the same business as plaintiff and defendant do, and that this information is continuously and frequently supplemented by various sources, especially by the manufacturers of chemicals, nevertheless the plaintiff maintains a group of employees whose work carries them beyond this information and who furnish their discoveries, in confidence, to other employees of the plaintiff in order that these may use it in the plaintiff's business. The group of employees mentioned is called the technical department. Their duties, in addition to training employees and assisting in the performance of unusual tasks, are to investigate characteristics of the various substances offered for use in the plaintiff's business, to devise procedures for the safe and efficient use of the substances chosen for use by the technical department (some of which are very dangerous to person and to property), and to collect and disseminate among plaintiff's organization this and other information about methods, practices and procedures to be followed and used in the plaintiff's business. This

information was conveyed by the technical department to the employees who used it by means of the confidential bulletins which we have already referred to. The proof shows as a matter of law, within the meaning of the rules of decision which we have summarized, that during the term of the contract between the plaintiff and the defendant, the plaintiff's technical department imparted to the defendant, pursuant to their duty and the defendant's duty and in confidence, information which was of value in the conduct of plaintiff's business, concerning all of the various matters which we have mentioned, such as methods, practices, substances and incidentals thereto.

Necessarily this information would be used by the defendant in the conduct of his own business and only by enforcing specifically the covenants against competition which are set out in paragraphs 6 and 7 can the wrongful use of this information by the defendant be prevented.

Since the parties are actually engaged in the same business in the same area, and soliciting in part the same group of customers, there is no issue of fact concerning the reasonableness of the area covered by the injunction or the necessity of the injunction to protect the plaintiff's lawful injury. The character and extent of the injury done by a former employee's use for his own profit of business secrets imparted to him by his employer in confidence is not like that done by the former employee's use of special influence with customers. Where the employee uses business secrets, the employer loses not only the potential customer captured by the employee, he is also apt to lose his property interest in his secret by the employee's use of it if the subject matter of the secret is not protected or copyrighted, the employee is using for his own benefit and profit something which is in the nature of a property right, and several suits may be necessary to protect the right if the injunction be not granted. If information is copyrighted, there is no danger that the property right will be lost, but the remedy in damages is not wholly adequate for others of these reasons. It may be, or it may not be true, that an injunction ought

not to be granted to a former employer which will enforce nothing except an empty right from which the former employer cannot reasonably be expected to profit. See the note at 6 T.L.R. 502, and see Williston, Sec. 1643, pg. 4611, note 7, 1937 Edition. However, the plaintiff's right is not an empty one under the facts here; the parties are in direct competition.

We have had some question as to whether the two years of non-competition for which the defendant contracted and which the trial court granted was necessary to protect the misuse of trade secrets, because of Fellton's testimony showing that these secrets eventually passed out of the defendant's possession. However, the following testimony of Fellton's, which was not contradicted by the defendant (although from his long employment by the plaintiff, as a serviceman, salesman and manager of an important office, he seemingly could have done so had Fellton misstated the facts) supports the two year period of time during which the injunction runs. Fellton testified:

"Q. There is nothing to prevent your competition going to the Fish and Wild Life Service for information? A. No, that is true, but the Fish and Wild Life men are like I was in the Public Health Service. They are not completely aware of the problems of the commercial operator. For a number of years we had a method of getting into a closet in a kitchen without having to move all the dishes out. That in itself was an important trade secret; but today our competitors do that; by a device that previously had been used only in service station lubrication, spraying the oil.

"Q. Alemite process? A. Yes; we were the first to use it. I wouldn't claim it to be secret now, but I would say that today, and last year, and the year before, we did have some methods, some techniques, some equipment, some materials, that our competitors did not have, and were not available to them in any of the literature they can get.

"Q. You say that most of your competitors have knowledge of the various chemicals? A. No, I am quite ready to

concede that some of our competitors may have materials which are secret to us.

"Q. Your competitors could go around in the field and check on your methods, could they not? A. It may not be possible to keep these things secret too long; it is going to come out; but during that time it is a tremendous advantage to us. By the time that comes out there may be other things you have got. I make no claim to our ability to keep one of these secrets indefinitely. I say while we have them, they are of tremendous benefit to us."

█ We have last to consider the fact that at least much of the confidential information furnished the defendant by the technical department was copyrighted. The evidence is quoted in our findings which shows that the copyrights are plaintiff's and this disposes of the question of ownership. It raises, however, a question concerning secrecy. Note the Court's comments regarding the English patents in Kaumagraph Co. v. Stampograph Co., 235 N.Y. 1, 138 N. E. 485. It may be that other persons could go to the office of the United States Government in which copyrighted matter is deposited and there read the document for themselves. However, it is wholly unlikely that they would do so, and one who copied and abstracted the document for a price would probably be violating the copyright. 34 Am.Jur. 453 (Sec. 71); 18 C.J.S., Copyright and Literary Property, §§ 94(a), (c), pp. 215, 217. In actual fact, the information in the plaintiff's bulletins is secret, and to all practical purposes it will remain so despite its deposit in the copyright office. For violation of the copyright the plaintiff is entitled to an injunction, according to the rules of Equity. 34 Am.Jur. 473 (Sec. 101); 18 C.J.S., Copyright and Literary Property, § 130, p. 243. For use of the information by the former employee which falls short of a violation of the copyright, we think covenantee entitled to injunction on the ground that the legal remedy is inadequate.

### Point I

Under Point 1, the defendant says that it was an issue of fact for the jury whether the written contract between plaintiff and defendant was made in New Orleans and that this issue was material because the law of Louisiana, as expressed in certain statutes, determines the validity of the restrictive covenants if the contract was made in Louisiana, and declares these covenants void.

The following statement of the Louisiana statutes which the plaintiff has not contradicted is taken from the defendant's brief: "During the year in which the contract at issue in this case was signed, Sections 1–3 of Act number 113 [133] of the 1934 Acts of Legislature of the State of Louisiana (Section 4963.3 of Dart's Louisiana General Statutes) provided as follows:

"'4963.1 Employees contracting not to engage in competing business prohibited.—It is hereby declared to be the public policy of this state that employers shall not require or direct their employees or any one of them, to enter into any contract, written or verbal, with such employers, whereby and whereunder the employee agrees and contracts not to engage in any competing business for themselves or as the employee of another upon the termination of their contract with such employer. (Acts 1934, No. 133, § 1.)

"'4963.2. Noncompeting contracts of employee null and void.—If any contract as above set forth, contains any such provisions, as above provided, same shall be null and void as to those provisions. (Acts 1934, No. 133, § 2.)

"'4963.3. Enforcement of contracts by injunction prohibited. The courts of this state are hereby prohibited from issuing any restraining orders or temporary or permanent injunctions to enforce any such contract containing any of the prohibited provisions. (Acts 1934, No. 133, § 3.)'

"On May, 1950, the Louisiana Revised Statutes became effective. [LSA–]R.S. 23:921, based on the above-quoted statute, provided as follows:

"'s921. Competing business; contracts against engaging in forbidden; enforceability of provisions. No em-

ployer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court.'"

Defendant's execution of the written contract must have been prerequisite to defendant's continued employment in the post which the contract governed; and so it may be said that plaintiff *required* defendant within the meaning of these statutes to make the restrictive covenants. It is not so apparent that the Louisiana courts would construe these statutes as prohibiting such covenants as defendant made to plaintiff if such covenants were necessary in fact to prevent a former employee's use, for his own profit, of trade secrets imparted to him in confidence by his employer. However, for the purpose of discussion we resolve this question in defendant's favor (without undertaking to decide it) and assume that if the validity of the restrictive covenants in defendant's contract with plaintiff is to be determined by the Louisiana statutes then the covenants are void and the injunction should not have been granted.

Point 1 is overruled on two grounds.

First, the proof does not sustain the defendant's argument. This proof is summarized and discussed in our findings, and such of it as tends to show where the contract became effective shows that the last act required to make a contract between the parties was the execution of the written contract by the plaintiff's president, and that this act was done in Atlanta, Georgia. Further, there was not much of any more than a scintilla of proof that defendant Grace himself signed the contract in New Orleans. It was not an issue of fact that the written contract was executed and became effective in New Orleans.

Second, the Louisiana law is not applicable to the operation of the restrictive covenants in Texas. The operation of these covenants can be conveniently divided by the boundary between Texas and Louisiana. This the parties intended to be done if the Louisiana statute prohibited such covenants; and they intended further in such a case that the validity of the covenants be determined by the Texas law so far as those covenants operated in Texas. In applying their own rule of decision governing conflicts of laws, and they apply no others in cases such as this, the Texas courts only give effect to this intention (as they have in other matters pertaining to contracts) and will under the facts before us, apply the system of law intended by the parties. These conclusions were drawn from matters now to be stated. The circumstances under which the covenants are valid in Texas are indicated in our discussion of Point 3; and we have held that the judgment, enforcing the covenants in paragraphs 6 and 7 of the contract, is supported by the proof under the Texas rule of decision.

The facts pertaining to Point 1, some of which have been stated, are these. Plaintiff is a Louisiana corporation and seems to be one of at least two corporations having common management, of which the other seems to have an office in Atlanta which is sometimes referred to in the proof as the "home office". When the written contract was made defendant was an employee of plaintiff's and resided in New Orleans with his family; and Couhig, his superior officer, who offered him the post in Beaumont also resided there. We assume that both men were citizens of Louisiana. There was some discussion between Couhig and defendant after Couhig suggested that defendant take the Beaumont post, and Couhig and defendant came to Beaumont and made some investigation of the situation before he accepted this post. After acceptance the defendant came to Beaumont and entered upon the performance of his duties. All of this was done before the contract was signed. However, the parties have treated the written contract as being the defendant's contract of employment, and we note Couhig's testimony that written contracts had to be signed by the president of the plaintiff corporation. We take the arrange-

ment between Couhig and defendant Grace to have been conditioned upon the president's signature of the written contract.

When Couhig offered the post to defendant, the office or place of business of the employee whom defendant was later to replace seems to have been in Beaumont, Texas, and the written contract itself refers to the office as the "Beaumont Office." Defendant was at work in Beaumont on July 26, 1949, as correspondence between him and Couhig shows; defendant was then acquainting himself wtih plaintiff's customers and was beginning to conduct plaintiff's business. Later, in September or October, 1949, defendant's family removed to Beaumont, and they and defendant have resided there since. Defendant's office was maintained at his home in Beaumont while he was in plaintiff's employ there.

We conclude that when the written contract was made the parties intended the defendant to establish his office and his residence in Beaumont, Texas.

The written contract does not define the area committed to the defendant's charge. It only provides that the defendant is employed as "manager, Beaumont, Texas." and other references are made to the "Beaumont Office." The restrictive covenants in paragraphs 6 and 7, by defining the area within which these covenants are to operate, indicate that the term "Beaumont Office" referred to this area and that defendant was to conduct plaintiff's business within this area. The defendant in effect said that he was to do this, and this area actually was the area within which he conducted business for the plaintiff under the contract, although he did go out of it at times.

The area subject to the jurisdiction of defendant in the Beaumont office is described in the restrictive covenants as eight separate units, namely, the four cities of Beaumont, Port Arthur and Orange in Texas and of Lake Charles in Louisiana and the area adjacent to each of the four cities within a 25 mile radius of that city. Most of this area is in Texas and most of the custom and business to be served by the office to which defendant was appointed

was in Texas. We infer this from the fact that three of the four cities mentioned are in Texas and the plaintiff's office was in Texas.

We conclude that when the written contract was made the parties expected most of the business to be done by defendant, that is, most of the performance to be rendered by defendant, would be done in Texas. However, it was also intended that defendant would perform services under the contract in Louisiana; and he did, as we have stated, conduct business for the plaintiff in both states under the contract.

It is ordinarily to be implied that parties who have purportedly entered into a contract intended the agreement to be legally effective, and this implication has been frequently resorted to in settling questions of conflicts of laws, as decisions hereinafter cited show. See also: Pritchard v. Norton, 106 U.S. 124, 1 S.Ct. 102, 27 L.Ed. 104, at pages 108–109, but the written contract between plaintiff and defendant contains a provision which expresses this implied intention. In paragraph 9 it is provided: "This agreement shall not fail though any part of any clause thereof shall be indefinitely invalid." The meaning of "indefinitely invalid" is not clear, but the provision does indicate an intention that such parts of the agreement as are valid in law shall be given effect and thus implies that a severance to accomplish this end may be made when possible in fact. When this is added to the implied intention mentioned I think that we can say that the parties did not intend the right of severance to be limited to the particular kind of invalidity referred to by the words "indefinitely invalid." In connection with these remarks see Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 at page 1026, 12 L.R.A. 93, discussing the significance of a provision that the agreement was to be construed by the laws of Texas.

We conclude that the parties to the written contract intended their written agreement to be given such legal effect and validity as could be given it, and as an incident of this intention should be taken to have necessarily intended that validity be

determined by the system of law which would give effect to the agreement rather than by a system which would hold it invalid.

To do this in the case before us requires a severance in area in the operation of the restrictive covenants which is effected by the boundary line between Texas and Louisiana. This line separates some of the defined areas mentioned in the restrictive covenants and it divides others. It separates the city of Lake Charles and the 25 mile area adjacent thereto from the cities of Beaumont, Port Arthur and Orange and the 25 mile area adjacent to Beaumont, and it extends across the 25 mile area adjacent to Orange and probably, that adjacent to Port Arthur. However, the restrictive covenants only prohibit certain actions of the defendant and in enforcing these covenants by injunction, this severance can be made with ease and convenience. This severance is in accord with the Texas rule of decision, to which we have referred in our discussion of Point 2, which authorizes the court to limit an injunction against competition to that part of the area defined in the covenant which the parties were authorized to contract for. The severance is also compatible in part with the definition of area made in the restrictive covenants, which, as we have stated, refer to this area as being made up of eight distinct territorial units. Thus on the face of the contract itself, by the exercise of the "blue pencilling test" mentioned by Williston (Sec. 1659, 1937 Edition) a severance could be made which would enable an injunction to operate within the cities of Beaumont, Port Arthur and Orange and the 25 mile area around Beaumont.

The rules of law to be applied under these facts are as follows:

Where a contract is made in one state but is to be performed wholly in another state the validity of the contract is ordinarily determined by the law of the place of performance. But where it could be said that the parties intended the validity of their agreement to be determined by the law of one of these two states, this intention has often been given effect. The matter emphasized in these latter decisions has been the supposed intention of the parties, sometimes inferred from the fact that the parties had made an agreement and thus presumably intended an effective one.

Thus, in Ryan & Co. v. Missouri, K. & T. Ry. Co., 65 Tex. 13, a contract of carriage was made in Missouri to carry goods from the place where the contract was made to a place in Texas. The bill of lading contained limitations upon the carrier's liability which were valid under the Missouri law but were invalid in Texas. The Texas court applied the law of Missouri on the assumption that the parties intended to make a valid contract and so must have intended the law of Missouri to apply. Said the Court: "The foundation principle seems to be that the presumed intention of the parties must govern; if from all of the circumstances surrounding the contract, it is reasonable to suppose that they had in view, at the time, the law of the place of the contract, that must prevail; if the law of the destination of the goods in reference to the carriage of the agreement (sic) then that law must govern. When there are no circumstances attending the transaction, except the mere execution, delivery and acceptance of the bill of lading, the safest rule by which to arrive at the intention of the parties, is that which upholds the contract rather than that which defeats it. Parties to a contract are presumed to intend that it shall be enforced. It is not presumed that they deliberately executed an agreement, knowing that it was invalid. The carrier in this case must have intended to secure to itself some real protection from responsibility in the cases excepted in the bill of lading; and the appellee, that he should have this protection. By the laws of Missouri it was afforded, by the laws of Texas it was not. To give validity to the contract and thus carry out the intention of the parties, we must apply to it the laws of the former state, and, it is our opinion that by these laws its validity must be determined. This principle is applied frequently to cases where a contract is made in one state for the payment of money in

another. Although the contract is to be wholly performed in another state where the rate of interest agreed upon is usurious, yet, if by lex loci contracts it is lawful the interest may be recovered."

This rule of intention has since been applied by the Supreme Court in cases such as those just mentioned, which involved contracts for the payment of money. Thus in Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024, the promissory note was both made in and payable in New York, although the maker was a citizen of Texas. It provided for a rate of interest valid in Texas but usurious in New York. The court held that the parties could elect which legal rate of interest, that is, which system of law, would be applicable, and affirmed the judgment of the trial court which held the provision for interest not usurious. This rule of intention was recognized in Building & Loan Ass'n v. Griffin, 90 Tex. 480, 39 S.W. 656, but was held inapplicable because the provision for performance was, under the facts, a device to avoid the operation of the usury laws of Texas. That is, it was a matter of form only and did not truly indicate the intention of the parties regarding the system of law applicable. The court said in 39 S.W. at page 660: "This, however, is not a case in which the doctrine of comity can be invoked. The contract in question was not in fact made with the intention that it should be enforced or performed in the state of Dakota, and there is in truth no conflict between the laws of the two states to call upon the courts of this state for the exercise of comity towards our sister state." The provisions of Grace's contract of employment were obviously not a device, that is, a form assumed which was inconsistent with the real intention of the parties, to escape the operation of the laws of Louisiana. Witness the circumstances that Grace was to establish his residence in Texas, was to have his office there, and was to do most of his work there. The performance of the contract, though partly to occur in Louisiana, was really mostly performable in Texas.

The rule of intention has also been recognized in cases involving insurance contracts. See: Seiders v. Merchants Life Association, 93 Tex. 194, 54 S.W. 753 and Fidelity Mutual Life Association v. Harris, 94 Tex. 25, 57 S.W. 635. And in Metropolitan Life Ins. Co. v. Bradley, 98 Tex. 230, 82 S.W. 1031, 1032, 68 L.R.A. 509, where the contract was made in Texas but was performable in New York, it was held that a New York statute did not apply because: (a) the statute did not apply to such a contract. "The rule that a contract to be performed in a particular state is to be construed and enforced, as to some things, at least, by the law of that state, has its support in the presumption that the parties had in mind and contracted with reference to that law. This, of course, can be said only of the laws that apply to the contract which they made." (b) The policy contained provisions which dispensed with performance of this statute by the insurer and thus showed that the parties did not intend it to apply. "In the face of these plain stipulations it cannot be presumed that the parties intended their contract to be governed by the statutory provisions concerning notice."

Where the contract was made in one state but was to be performed partly in that and partly in another state, the court has ordinarily determined the validity of the contract by the law of the place where the contract was made.

This was done in Ryan v. Missouri, K. & T. Ry. Co., supra, but the reason was the supposed intention of the parties', which, if followed, gave effect to the provision in question.

And this was done in Western Union Tel. Co. v. Douglass, 104 Tex. 66, 133 S.W. 877, without any reference to the matter of intention or to any decision we have mentioned; but the result was exactly the same as in Ryan v. Missouri, K. & T. Ry. Co. We note that the opinion was written by the same Justice who wrote the opinion in Fidelity Mutual Life Ass'n v. Harris and Metropolitan Life Ins. Co. v. Bradley. We also note that the Justice who wrote the opinion in the Seiders case was also a member of the court when the Fidelity and the Western Union cases were decided.

The statement of reasons made in the Western Union case is about equivalent to the statement of a rule, and the discussion is not so detailed as to require the conclusion that the court, still substantially of the same membership as we have noted, intended to qualify the statements of law made in the Seiders, Fidelity and Metropolitan cases. Burgess v. Western Union Tel. Co., 92 Tex. 125, 46 S.W. 794, may be given the same effect, insofar as concerns the holding made that the law of Louisiana was applicable.

In Rue v. Missouri Pacific Ry. Co., 74 Tex. 474, 8 S.W. 533, a statute of the state where the contract was made was applied to certain provisions of the contract and these provisions, as a result, were held to be invalid. But the law concerning conflicts of laws was not discussed. The court held the statute to be a limitation upon the powers of the corporation and the statute was applied for that reason; the *place* of making was an accidental circumstance without special significance. Another element of the contract (a lease) was held invalid because it, too, was ultra vires.

It seems to us that if the court, in determining what system of law to apply, will give effect to the parties' intention, real or supposed, where the contract is to be wholly performed in one state, though made in another, there is no reason why the courts should refuse to do so where the contract is to be performed in more than one state *and* the operation of the contract or provision within a state may be severed from the operation of the contract or provision in other states, as is the case here.

Such a case of severability is not like that where the nature of the contract compels the court to determine the validity of the contract or provision by some one system of law. This was true in Morgan v. New Orleans, M. & T. Ry. Co., 17 Fed.Cas.No.9804, pp. 754, 758, and the court resorted to the law of the place where the contract was made, saying: "In this embarrassment, I do not know that I can do better than to fall back on the general rule that a contract is to be governed by the law of the place where it is made. The presumption, that where a contract is to be performed in a different jurisdiction, the parties must be intended to have in view the laws of the latter, seems to be repelled when the performance is to take place in several different jurisdictions. For when there are two equal and opposite presumptions, neither of them can prevail." This reasoning has been repeated. See Oakes v. Chicago Fire Brick Co., 388 Ill. 474, 58 N.E.2d 460, citing Bernstein v. Lipper Mfg. Co., 307 Pa. 36, 160 A. 770, and repeating the statement in the latter case that where performance is to be made in several states the law would "find itself in a hopeless tangle" unless it resorted to the law of the place where the contract was made. The fact of severability in the operation of the restrictive covenants before us eliminates this possibility of confusion. In this case the court can apply the law of Texas to the operation of the defendant's covenants in Texas as easily as the court can apply the law of the place of performance where the performance is to be made wholly in one state.

In Ryan v. Missouri, K. & T. Ry. Co., 65 Tex. 13 at page 17, the court referred to the question concerning the use of more than one system of law to determine the validity of a contract provision in the following language: "It is not to be presumed that the parties intended to divide up their contract as to have it governed by different laws accordingly as a loss might occur in one or another state, unless circumstances were proved showing such an intention." The court's previous language regarding the effect to be given the fact that the parties contracted with reference to the law of one state rather than the law of another indicates that in the case mentioned in the quotation just made the court *might* follow the parties' intention and apply different systems of law.

This seems to have been done by the Supreme Court of Utah in Stone v. Union Pacific Ry. Co., 32 Utah 185, 89 P. 715 at page 722, in determining the validity of an employee's release of liability for injuries

which was made in the contract of employment, before any injury occurred.

The significance of the fact that a contract, though actually to be performed in several states but is *primarily* to be performed in one state, is recognized in Morgan v. New Orleans M. & T. R. R. Co., supra, and such a case was distinguished from that before the court. Having made the statement which we quoted, the court said: "I do not mean to say that where the main and principal part of a contract is to be performed in a state different from that in which it is made, the presumption will not arise that it is made in reference to the laws of such place of performance, even though some minor and incidental parts are required to be performed in still different states. Such may, very possibly, be the result in many instances that may occur. When they happen they will be governed by the force of their own circumstances. But I do not see that I am called upon to apply any such exceptional rule in this case." In Atchison T. & S. F. Ry. Co. v. Smith, 38 Okl. 157, 132 P. 494; the fact that most of the contract of carriage was performable in Oklahoma was referred to as a circumstance indicating that the parties intended the law of that state to be applicable; and for that reason and in order to give effect to the parties' implied intention to make an effective agreement, the law of that state was applied. We note that the injury occurred in Oklahoma. Chicago R. I. & P. R. Co. v. Thompson, 100 Tex. 185, 97 S.W. 459, 460, 7 L.R.A.,N.S., 191, involved to some extent the exception noted in the Morgan case, and the court held that performance of an incidental matter in one state would not preclude the application of the law of the state where the main performance was to be made and the contract itself was also made. Said the court: "Besides, this stipulation (it required notice of injury to be given in Kansas, the contract itself having been made in Oklahoma) was only an incidental part of the contract of service which was to be performed in the Indian Territory and Oklahoma. The mere fact that the notice was to be received at a place in Kansas does not make the contract performable there in any such sense as to justify the inference that the parties intended to subject their rights to the laws of that state rather than to those of the place where the contract was made, where they were to remain, and where they were to do most of the things to be done in carrying out their engagements." Here again the court has acted on the basis of the parties' intention. The opinion was written by Justice Williams, who wrote the opinion in the Fidelity and Metropolitan cases; and Justice Brown, who wrote the opinion in the Seiders case, was also a member of the court.

It is true that the performance which the defendant Grace was to make in Louisiana cannot be described as a mere incident of his real performance, as the provision for notice was described in Chicago R. I. & P. Ry. Co. v. Thompson. Further, none of the three decisions just cited involved any consequence of severability in or under the provision in question. Nevertheless, these decisions do show an effort to apply the system of law which, it was supposed, the parties thought their rights would be governed by, although performance was not wholly limited to one state. If, as in Chicago R. I. & P. Ry. Co. v. Thompson, the court will put aside incidental matters, and if in other cases the court has given effect to the parties' intention, it seems reasonable to follow a severance which the parties have made in the operation of their agreement and to test the validity of the agreement by the law of the particular state in which one whole severable part of the agreement has been put.

We have concluded that in determining which system of law shall be used to determine the validity of the defendant Grace's restrictive covenants, we may follow the severance intended by the plaintiff and the defendant and may apply the Texas law to the operation of the covenants in Texas. This is not only in accord with the parties' intention; it accomplishes justice between the parties on the facts by giving effect to their agreement.

In passing, we call attention to the fact that the parties' intention that the validity

of a contract or of a provision therein shall be tested by one system of law rather than by another has been given effect by the courts only within certain limitations. See: 15 C.J.S., Conflict of Laws, § 11, p. 893(2) "Limitations on rule," 17 C.J.S., Contracts, § 12, p. 337. We are not to be understood as having held that the plaintiff and defendant could have adopted any system of law other than that of Louisiana or Texas; and we are not to be understood as having held that the validity of a contract or a provision in it which, or in the operation of which, the parties did not intend a severance, is to be separately tested by the law of each state in which it may operate, even though the parties themselves may have expressly said that it was to be.

## Other Points

 Point 3 reads: "This case should be reversed because the contract of employment on its face is a unilateral agreement unenforceable by either beyond the term of employment of appellant."

Point 3 is overruled. The contract was not unilateral in the sense that it imposed no obligation on the plaintiff, for the plaintiff was bound to employ the defendant for three months and to give defendant 15 days notice of termination. The defendant received a valuable consideration for his covenants when the contract was made; since he was given employment in the Beaumont post. This employment was actually a promotion for him, and there is no evidence that this promotion was forced upon him. Indeed, the circumstances indicate that it was not. It does not appear that the employer abused his power over his employee or committed a breach of contract; the employment lasted more than two years and the defendant himself was the initiating cause of its ending. Enforcement of the restrictive covenants within the area mentioned in the covenants, for the reason that the defendant Grace would otherwise misuse confidential information given him by his employer, will not be of that unjustifiably harsh sort for which specific performance will be refused. The decisions in May v. Lee, Tex.Civ.App., 28 S.W.2d 202, 208;

Union Transfer & Storage Co. v. Greve, Tex.Civ.App., 131 S.W.2d 796, and Super-Maid Cook-Ware Corp. v. Hamil, 5 Cir., 50 F.2d 830, 832, cited by the defendant, are not in point. The Texas decisions listed in our discussion of Point 2 involve several instances in which contracts of this sort made by plaintiff and defendant have been enforced.

 Point 4 assigns as error that the Louisiana statutes which have been quoted are a limitation upon the plaintiff corporation's power to contract and that the restrictive covenants are invalid even though the contract was made outside of Louisiana. Point 4 is overruled on the authority of Fidelity Mutual Life Association v. Harris, 94 Tex. 25, at page 34, 57 S.W. 635. The statutes quoted are a part of the general law of Louisiana which regulates the relationship between employers and employees generally, are applicable as well to individuals as to corporations, and were not intended to be a special limitation upon the powers of Louisiana corporations.

 Point 5 reads: "This case should be dismissed because appellee failed to allege or prove that the contract here in question was for special, unique, or extraordinary personal services requiring special merit or qualifications, or that the services to be rendered are purely intellectual, or are peculiar and individual in their character." Point 5 is overruled. The contract between plaintiff and defendant has terminated and the object of the suit is to prevent injury to the plaintiff, not to enforce in a negative way the defendant's promise to work for the plaintiff. See: McCall Co. v. Wright, 198 N.Y. 143, 91 N.E. 516; and 8 T.L.R. 431. The typical case of the route salesman for the ice company and the laundry company, in which so many injunctions have been granted the employer against the salesman by the Texas courts, does not involve any special, unusual or unique service nor any specially gifted, trained or equipped employee.

The various Points of Error assigned are overruled and the judgment of the trial court is affirmed.