DOCUTEL CORPORATION, Plaintiff,

v.

S. A. MATRA and Matra Informatique, Defendants.

Civ. A. No. CA–3–77–1362–D.

United States District Court, N. D. Texas, Dallas Division.

Jan. 25, 1979.

Ernest E. Figari, Jr., Hewett, Johnson, Swanson & Barbee, Dallas, Tex., for plaintiff.

David C. Briggs, G. R. Poehner, Werner A. Powers, Coke & Coke, Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT M. HILL, District Judge.

Came on for consideration defendants' motion to dismiss or alternatively, to stay plaintiff's action. Defendants S.A. Matra ("Matra") and Matra Informatique ("Informatique") contend that this court does not have personal jurisdiction over them because the plaintiff Docutel Corporation ("Docutel") can not reach them through Texas' long-arm statute, Tex.Rev.Civ.Stat. Ann., art. 2031b, made applicable by F.R. Civ.P. 4(d)(7) and 4(e). Defendants further contend that the assertion of personal jurisdiction over them would violate the Due Process Clause of the Fourteenth Amendment. On September 14, 1978, this court held a hearing concerning the issue of personal jurisdiction, deferring consideration of the other grounds that defendants raise in their motion to dismiss. After reviewing the briefs, affidavits and discovery filed in this case, and considering arguments of counsel and the testimony presented at the above hearing, the court is of the opinion that defendants' motion should be denied.

### The Facts

Docutel is a Delaware corporation whose headquarters and physical plant are located in Dallas County, Texas. It develops, manufactures, and markets automated financial transaction systems, including automated teller machines and cash dispensing machines. Matra is a large French corporation located in Paris, France, which operates in a variety of fields, including aerospace and electronics. From 1971 until January 1, 1977, Matra operated a data processing division called Informatique which sold computer equipment throughout Europe. In 1975, Matra's Informatique division became interested in marketing Docutel's automated

tellers in Europe. During the course of 1975, it sent technical and marketing personnel to Docutel's offices in Dallas County, Texas, to learn about and discuss its automated banking products. On February 26, 1976, Matra and Docutel entered into a confidentiality agreement, signed in Docutel's offices, covering the information disclosed to Matra. Further negotiations with Matra representatives in Dallas led to a September 24, 1976, agreement which provided for Docutel to develop, manufacture, and sell to Matra's Informatique division 60–100 specially adapted automated tellers. Tony DeGraaff ("DeGraaff"), the number two person in Matra's hierarchy, and Homer Kirby ("Kirby"), a vice-president in charge of Docutel's international operations, headed the negotiations. DeGraaff signed the agreement for Matra as a commercial director.

Pursuant to the agreement, several representatives of Matra visited the offices of Docutel to discuss equipment specifications and other technical matters. Also pursuant to the agreement, Docutel sold and delivered to Matra in Dallas County, Texas, a prototype of the specially adapted automated teller. In December of 1976, Docutel issued an invoice to Matra for the cost of the prototype in the sum of $25,902.59, which Matra paid in March of 1977. In February and May of 1977, Docutel sent two more invoices to Matra for the rendering of technical assistance in the amounts of $6,894 and $3,690. Matra has only paid the first invoice.

About January 1, 1977, Matra's Informatique division became a distinct corporation known as Matra Informatique. Matra owns 55% of the common stock of Informatique, and TRW, Inc., an Ohio corporation authorized to transact business in Texas, owns the remaining 45% of Informatique's common stock. In connection with Informatique's incorporation, Matra assigned the September 24, 1976, agreement with Docutel to Informatique. Kirby testified at the hearing on September 14, 1978, that in January of 1977 DeGraaff had orally informed him of Informatique's incorporation and

that, in response, he had told DeGraaff that he wished to deal with Matra only and that he wanted Matra to stand behind all agreements with Informatique. DeGraaff continued to deal with Kirby as he had dealt with him prior to incorporation of Informatique.

On April 20, 1977, Kirby sent a telex to DeGraaff and Patrick Dulac, a computer engineer employed consecutively by Matra and Informatique, which proposed Docutel's development, manufacture, and sale to "Matra" of specially modified cash dispenser units. These units are referred to as "EEC units" (European Economic Community units) in the telex, which states:

"ATTN: TONY DEFRAAFF
PATRICK DULAC

AS A RESULT OF THE DULAC/POUSSARD MEETING IN DALLAS THE FOLLOWING ARE DOCUTEL'S PRICES. THIS NEW EEC UNIT WILL BE OFFERED IN ONLY ONE MODEL WITH ONLY OPTION, I.E. WITH OR WITHOUT DEPOSITORY. ALL IN ACCORDANCE WITH DOCUTEL'S SPECIFICATION 710–0095–001 DATED 15 APRIL 1977 AND DELIVERY FOB DALLAS.

A. FOR MINIMUM QUANTITY OF 200 FIRMLY ORDERED UNITS MODEL WITHOUT DEPOSITORY WOULD BE U. S. $20,263 EACH. MODEL WITH DEPOSITORY WOULD BE U. S. $23,327 EACH. ORDER MUST INCLUDE MINIMUM OF 100 WITH DEPOSITORY.

B. AS AN ALTERNATE, IF MATRA WILL PAY TO DOCUTEL $419,-000 AS A PART OF FRONT END DEVELOPMENT COSTS, THE ABOVE PRICES ON AT LEAST 200 UNITS WILL BE U. S. $17,449 EACH FOR UNITS WITHOUT DEPOSITORY AND U. S. $20,08888 EACH FOR UNITS WITH DEPOSITORY. ALSO MINIMUM 100 WITH DEPOSITORY. INDEXING AS IN SEPTEMBER 1976 AGREEMENT WILL ALSO APPLY.

ALTHOUGH UNIT WILL BE APPLICABLE FOR BOTH FRANCE AND BALGIUM, MINIMUM QUANTITY OF 200 MUST BE FIRM AND NOT DEPENDENT UPON BALGIAN BANK POOL ORDER.

THESE PRICES APPEAR TO BE CONSISTENT WITH THE DESIRED RETAIL PRICE OBJECTIVES EXPRESSED BY DULAC AND POUSSARD BUT MUST BE AGREED TO WITHIN NEXT FIFTEEN DAYS.

ONE CARTE BLUE 100 FF DISPENSER PROTOTYPE TO PARIS BY 1 OCTOBER 1977. SIX PRE–PRODUCTION UNITS TO PARIS STARTING 15 APRIL 1978 AT ONE PER WEEK. PROTOTYPE AND PRE–PRODUCTION UNITS AT PRICE OF U. S. 30,700 EACH. PRODUCTION DELIVERY SCHEDULE TO BE AGREED UPON.

THIS OFFER IS SUBJECT OF COURSE TO SATISFACTORY RENEGOTIATION OF THE CONTRACT OF 24 SEPTEMBER 1976. ON THIS BASIS, DOCUTEL WILL PREPARED TO IMMEDIATELY COMMENCE ACTIVITY ON THE EEC MACHINE PROVIDED MATRA (NOTWITHSTANDING COSTS UNDER THE 24 SEPTEMBER 1976 CONTRACT) WILL ALSO FULLY REIMBURSE DOCUTEL FOR ANY ADDITIONAL COSTS HEREUNDER IN THE EVENT CONTRACT RENEGOTIATION IS NOT SUCCESSFUL.

WE WELCOME DEGRAFF AND OTHERS TO VISIT DALLAS SOON TO RENEGOTIATE FORMALITIES. PLEASE ADVISE.

BEST REGARDS,
HOMER KIRBY—DOCUTEL"

DeGraaff sent a telex to Kirby in return on April 25, 1977, which states:

"ATT: MR. HOMER KIRBY
THANK YOU FOR YOUR TELEX OF 20TH INST. STOP THE TEXT IS CONSIDERED BY US AS A GOOD BASIS FOR NEGOTIATION AND I AM PREPARED TO MEET YOU IN ORDER TO RENEGOTIATE OUR ORIGINAL CONTRACT AND COVER THE NEW SITUATION, BOTH IN FRANCE AND IN BELGIUM BY AN ADDENDUM.

STOP I WILL SUGGEST IN THE COURSE OF A DAY OR TWO THE POSSIBLE DATES WHEN WE COULD CARRY OUT DISCUSSIONS, BUT IN THE MEANTIME CAN YOU ADVISE ME IF YOUR PLANS BRING YOU TO PARIS, WHICH OF COURSE WOULD BE MOST USEFUL TO ME AS MY AVAILABILITY IS VERY LIMITED JUST NOW STOP IN ANY CASE, I CONSIDER THAT YOUR TELEX IS CLOSE ENOUGH TO OUR VIEWS TO ASK YOU TO PROCEED IMMEDIATELY BOTH WITH THE DEVELOPMENT OF THE EEC MACHINE AND THE PREPARATION OF THE BRED PROTOTYPE STOP THE DATE WHICH WE HAVE UNDERTAKEN TO OBSERVE WITH BOTH BELGIUM AND FRANCE ARE IMPERATIVE, AS YOU HAVE ALREADY UNDERSTOOD, AND THEREFORE CONSIDER THAT YOU ARE STARTING TO WORK ON BOTH PROJECTS AT THE RECEIPT OF THIS TELEX, AND THAT THE LEGAL DETAILS WILL BE SETTLED AT OUR FIRST MEETING STOP PLEASE CONFIRM BY TELEX YOURS TRULY T. DE GRAAFF"

Kirby replied on April 27, 1977, by a telex to DeGraaff stating:

"ATTN: TONY DEGRAAFF THANK YOU FOR YOUR APRIL 25 TELEX. WE HAVE IMMEDIATELY COMMENCED ACTIVITY ON THE NEW MATRA EEC PROJECT. UNFORTUNATELY, I AM NOT SCHEDULED TO RETURN TO EUROPE FOR SEVERAL WEEKS, THEREFORE I AWAIT WORD FROM YOU AS TO WHEN YOU MAY BE ABLE TO VISIT US IN THE UNITED STATES FOR CONTRACT REVISION. BEST PERSONAL REGARDS, HOMER KIRBY—DOCUTEL"

These telexes form the alleged contract sued upon by Docutel in this case. In addition to its breach of contract claim, Docutel claims that defendants made fraudulent promises in the telex exchange in violation of the Texas Deceptive Trade Practices—Consumer Protection Act, Texas Business and Commerce Code, §§ 17.41 et seq., and their common law duty. Docutel served process in this case on the defendants through the Secretary of State of Texas pursuant to Tex.Rev.Civ.Stat.Ann., art. 2031b.

### Discussion

■ This court cannot assert jurisdiction over a non-resident defendant in a diversity suit unless (1) the plaintiff establishes personal jurisdiction pursuant to Texas law and (2) the exercise of personal jurisdiction under Texas law comports with the Due Process Clause. *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483 (5th Cir. 1974). Docutel must carry this burden of establishing jurisdiction over Matra and Informatique. Accordingly, the court will examine each defendant separately to determine whether Docutel has carried its burden.

### Informatique
#### A. Contract Claim

■ Docutel may assert personal jurisdiction over Informatique on its contract claim under the Texas long-arm statute if it can make a prima facie showing of a contract with Informatique performable in whole or in part within Texas. *See Walker v. Newgent,* 583 F.2d 163, 166 (5th Cir. 1978). The telexes, *supra,* establish a prima facie contract performable in whole in Texas for whose breach Docutel seeks recovery. Therefore, Docutel has acquired personal jurisdiction over Informatique under Texas law.

The telex from Kirby on April 20, 1977, offers to "immediately commence activity on the EEC machine provided Matra (notwithstanding costs under the 24 September 1976 contract) will also fully reimburse Docutel for any additional costs hereunder in the event contract renegotiation is not successful." The telex also provides "one carte blue 100 FF Dispenser prototype to Paris by 1 October 1977." DeGraaff's response on April 25, 1977, asks Docutel "to proceed immediately both with the development of

the EEC Machine and the preparation of the bred prototype" and directs Docutel to consider that it is "starting to work on both projects at the receipt of this telex." Thus, this response evidences an acceptance of Docutel's offer which makes out a prima facie contract for the development of an EEC machine and preparation of a prototype by Docutel in exchange for a promise by Informatique to pay the costs incurred by Docutel in performing its obligations should the renegotiation of the September 24, 1976, contract fail.[1]

■ Informatique contends that, since the alleged contract was formed in France when it sent its telex accepting Docutel's offer, see Western Union Telegraph v. Fletcher, 208 S.W. 748 (Tex.Civ.App.—Austin 1919, no writ), French law governs Docutel's contract claim under Texas conflict of laws rules. Austin Building Co. v. National Union Fire Insurance Co., 432 S.W.2d 697 (Tex.1968). Therefore, Informatique argues that Docutel must make out a prima facie contract under French law in order to acquire personal jurisdiction under the Texas long-arm statute. Under Texas choice of law rules, the effect of a contract is determined by the law intended by the parties to control. Austin Building Co., supra, 432 S.W.2d at 701. Where a contract is wholly performable in a particular place, it is presumed that the parties intended the contract to be controlled by the law of that place. Teas v. Kimball, 257 F.2d 817, 823 (5th Cir. 1958). Since the subject contract is wholly performable by Docutel at its physical plant in Dallas County, Texas, the law of Texas governs its effect even though it was made in France.[2]

■ Since Docutel may reach Informatique under the Texas long-arm statute, this court has personal jurisdiction over Informatique if that reach comports with due process. Due process requires that Informatique have such "minimum contacts" with Texas "that the maintenance of the suit does not offend 'traditional notions of fair play and justice'" and that it should have performed some act "by which it purposefully avails itself of the privilege of conducting activities within the forum state [Texas]; thus invoking the benefits and protections of its laws." Great Western United Corp. v. Kidwell, 577 F.2d 1256 (5th Cir. 1978); cert. granted, —— U.S. ——, 99 S.Ct. 829, 59 L.Ed.2d 30 (1979).

■ Kidwell, supra, 577 F.2d at 1267 establishes that activities outside the forum state which have foreseeable effects in the forum state constitute "contacts" with the forum state for purposes of due process. In this case, Informatique not only foresaw, but commanded substantial activity in Texas when in the telex of April 25, 1977, it asked Docutel to "proceed immediately" with the development of the EEC unit and the manufacture of the prototype. The effect of the subject contract is sufficient in itself to satisfy the minimum contact requirement. See Kidwell, supra, id.

■ Even assuming, however, that the foreseeable effect of the subject contract does not establish the minimum contacts required by due process, Informatique has

---

1. Even if Informatique's directive to proceed with the preparation of the bred prototype is construed as a counteroffer to Docutel's offer to send "one carte blue 100 FF dispenser prototype to Paris by 1 October 1977", rather than as an acceptance of Docutel's offer to "commence activity on the EEC machine", Kirby's telex of April 27, 1977, stating "[w]e have immediately commenced activity on the new Matra EEC project" evidences acceptance of that counter-offer.

2. Informatique argues that the subject contract includes a term requiring performance by Docutel in France—the delivery of the prototype "to Paris by 1 October 1977" provided for in the April 20, 1977 telex. Whether the subject contract includes this term, and whether the term provides for delivery in France or in Texas, are questions for the finder of fact. Docutel should not be required to prove the disputed scope of the subject contract in order to establish the law it must apply in making out a prima facie contract for jurisdictional purposes. Furthermore, even if the subject contract required Docutel to deliver the prototype in France, Texas law would still govern the contract because "the focus of the contract was so centered in Texas that its validity should be determined by the laws of contract of that state." Teas, supra, 257 F.2d at 823–24.

had substantial dealings in Texas with other manufacturers of computer equipment. In connection with these dealings, several representatives of Informatique have visited Texas. From February 1977 through March 1978, Informatique purchased $1,048,156 worth of computer equipment from General Computer Systems, Inc., ("GCS") manufactured by it in Dallas County, Texas. Those purchases were made under a contract with GCS which Matra had assigned to Informatique. In January of 1977, Informatique entered into a contract bearing "some relationship with Texas" with TRW Datacom International, Inc., a corporation authorized to transact business in Texas. In that month, Informatique also contracted with Datapoint, a company headquartered in San Antonio, Texas, to purchase computer equipment. In connection with the GCS contract, a representative of Informatique visited the offices of GCS in Dallas County, Texas for two months. In June of 1977 two representatives of Informatique attended a national computer conference in Dallas, and later visited Datapoint in San Antonio. Also on April 18–19, 1977, two engineers from Informatique met with Docutel engineers in Dallas County to discuss automatic bank tellers.

Although the court in *Amco Transworld, Inc. v. M/V Bambi,* 257 F.Supp. 215 (S.D. Tex.1966), held that two one-day trips made to Texas by representatives of a French corporation for the purpose of soliciting business did not constitute "minimum contacts," Informatique had more extensive dealings in Texas than the defendant in *Amco.* Also unlike *Amco, supra,* this case involves substantial performance of the subject contract in Texas. Informatique's Texas dealings and the foreseeable effects of the subject contract establish more than sufficient contacts with Texas to satisfy due process.

By its contacts with Texas, Informatique purposefully availed itself of the privilege of conducting business in Texas and invoked the benefits of its laws. Although the subject contract does not by term require performance in Texas, when Informa-

tique entered into the contract, it could readily foresee that Docutel would commence development of the EEC unit at its facilities in Dallas County, Texas. *See Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 383 (6th Cir. 1968); *American Steel, Inc. v. Cascade Steel Rolling Mills,* 425 F.Supp. 301, 303 (S.D.Tex. 1975). Since the subject contract was wholly, or almost wholly, performable in Texas, it should have come as no surprise to Informatique that Texas law would govern its enforcement. *See Product Promotions, supra,* 495 F.2d at 496.

■ Finally, it is not unfair or unreasonable to require Informatique to defend this suit in Texas. Texas has a legitimate interest in providing a forum for a resident corporation to enforce a contract performable in Texas and governed by Texas law. It is just as inconvenient for Docutel to litigate in France as it is for Informatique to litigate in Texas. Informatique can well afford the defense of this suit in Texas, and so requiring it to litigate in Texas does not constitute a hardship rising to the level of a denial of due process. *See Product Promotions, supra,* 495 F.2d at 498. Informatique has not urged any policy considerations or inequities which make the extension of personal jurisdiction in this case unreasonable or unfair. *See Kidwell, supra,* 495 F.2d at 498.

Based on the foregoing, the court is of the opinion that it may exercise jurisdiction over Informatique pursuant to Tex.Rev.Civ. Stat.Ann., art. 2031b and consistent with the Due Process Clause of the Fourteenth Amendment.

### B. *Tort Claim*

■ Docutel alleges in its complaint that the promises by Informatique upon which it bases its contract claim were fraudulent; i. e., that Informatique did not intend to perform them when made. Article 2031b confers jurisdiction over any person who commits a tort in whole or in part within Texas. *Walker, supra,* 583 F.2d at 166. To establish jurisdiction over Informa-

tique on its claim of fraudulent misrepresentation, Docutel must make a prima facie showing that Informatique committed such a tort in Texas. *Product Promotions, supra,* 495 F.2d at 491. Docutel relies upon Informatique's nonperformance of its contractual promise to make its prima facie showing. The fact of non-performance of a promise, however, does not make out a prima facie case of fraudulent misrepresentation since it does not raise an inference that the promise was made with intent not to perform it. *See Medina v. Sherrod,* 391 S.W.2d 66 (Tex.Civ.App.—San Antonio 1965, no writ). Thus, Docutel has not made a prima facie showing of a fraudulent misrepresentation by Informatique in Texas.

 The Texas Supreme Court recently held in *U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977) that article 2031b "reaches as far as the federal constitutional requirements of due process will permit." Therefore, Docutel can assert jurisdiction over Informatique pursuant to article 2031b by establishing facts which support the extension of personal jurisdiction over a nonresident corporation in accordance with due process even if it can not establish a prima facie tort committed in Texas. The Texas Supreme Court has adopted a short-hand test for determining whether federal due process has been complied with:

(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state;

(2) the cause of action must arise from or be connected with, such act or transaction; and

(3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity

in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

*U–Anchor, supra,* 553 S.W.2d at 762 (citing *O'Brien v. Lanpar Co.,* 399 S.W.2d 340 (Tex. 1966)). Since Docutel's tort claim arises from the same facts as its contract claim, the assertion of jurisdiction over Informatique on its tort claim comports with due process for the same reasons that personal jurisdiction on the contract claim comports with due process. Elements (1) and (3) of the *O'Brien* test were expressly discussed, *supra.* Docutel's tort claim satisfies element (2) of the test because Informatique's purposeful contacts with Texas—the foreseeable effects of Informatique's promise to pay Docutel's costs of developing the EEC unit—give rise to Docutel's claim of fraudulent misrepresentation.[3]

### C. *Deceptive Trade Practice Claim*

Docutel's claim based upon the Texas Deceptive Trade Practices—Consumer Protection Act rests upon the same facts as its fraudulent misrepresentation claim, and jurisdiction over Informatique exists as to that claim for the same reason that it exists as to the fraudulent misrepresentation claim.

### *Matra*

### A. *Contract Claim*

#### 1. *Alter ego or apparent authority*

Docutel contends that Matra comes within the reach of the Texas long-arm statute because it entered into the subject contract either as the alter ego of Informatique or pursuant to the apparent authority of De-Graaff to bind Matra to the contract. Under its theory, Docutel must make a prima facie showing of DeGraaff's apparent au-

---

**3.** The court does not here suggest that the Texas Supreme Court intended to promulgate its own view of federal due process, tied to the construction of article 2031b, when it announced the *O'Brien* test. Rather, in its discussion *infra,* the court concludes that article 2031b extends to the limit of federal due process, construed according to federal precedent and Texas precedent. Since the exercise of jurisdiction over Informatique clearly comports with due process construed according to both Texas and federal precedent, the issue of which precedent to apply is not posed here.

thority or of Matra's alter ego relationship to Informatique. *Walker, supra,* 583 F.2d at 166–67; *Product Promotions, supra,* 495 F.2d at 492–93. The court is of the opinion that Docutel has failed to make a prima facie showing of either relationship.

■ Docutel asserts that Kirby had reason to believe that he was dealing with Matra when exchanging the telexes with DeGraaff that form the subject contract and Kirby avows that he did, in fact, believe he was dealing with Matra at such time. Affidavit of Homer J. Kirby at 5. Docutel's assertion cannot withstand Kirby's testimony at the hearing on September 14, 1977, that he knew in January of 1977, that Matra's Informatique division had incorporated and that DeGraaff represented Informatique in the negotiations. In fact, Kirby demanded that Matra "stand behind" any agreements concluded with Informatique.[4] Even assuming that DeGraaf, in his capacity as Commercial Director of Matra,[5] had made "manifestations" to Matra which could lead a person to infer that he acted on behalf of Matra, *see Product Promotions, supra,* 495 F.2d at 493, he effectively dispelled any reasonable basis for such an inference by communicating to Kirby Informatique's incorporation in January of 1977.

■ Docutel has not introduced sufficient evidence to substantiate its alter ego claim; i. e., that Matra exercised the high degree of control over Informatique necessary to impute its activities to it. *Walker, supra,* 583 F.2d at 167; *Product Promotions, supra,* 495 F.2d at 493. Informatique is not even a wholly-owned subsidiary of Matra, and DeGraaff's dual position as director of Informatique and Matra does not establish a prima facie case of alter ego. *Walker, supra,* 583 F.2d at 167.

### 2. Substantial contacts

■ Even though Docutel cannot establish a prima facie agency relationship which binds Matra to the subject contract, it can still reach Matra under the Texas long-arm statute if the assertion of jurisdiction over Matra comports with federal due process. *U–Anchor, supra.* In making such a determination, the Texas Supreme Court usually examines the elements set forth in *O'Brien, supra.* The second element of the *O'Brien* test requires that the plaintiff's claim arise from, or be connected with, the non-resident defendant's purposeful contacts in Texas. Since Docutel's contract claim arises from the exchange of telexes described above, and since Docutel has not provided satisfactory proof of Matra's involvement in that exchange, its claim does not arise from Matra's contacts with Texas.

Docutel contends, nevertheless, that Matra's contacts with Texas have been so substantial and continuous that the Texas long-arm statute should reach Matra even though its cause of action does not arise from those contacts. Matra's activities in Texas have indeed been continuous and substantial. From 1971 through 1976, Docutel purchased pursuant to contract computer equipment worth $8,303,494 from GCS, goods worth $100,000 from Datapoint, and goods worth $448,973 from TRW Controls Corporation, a Texas corporation headquartered in Houston, Texas. During this period, numerous representatives of Matra visited for periods of up to two months the offices and physical plants of these corpora-

4. At the hearing on September 14, 1977, Docutel first espoused the position that it sought recovery from Matra on a theory of guaranty. Docutel bases this theory on DeGraaff's oral communication to Kirby that Matra would stand behind any agreements with Informatique. The doubtful enforceability of DeGraaff's oral guaranty to one side, *see* Texas Business and Commerce Code, § 26.01(b)(2), the court cannot construe Docutel's complaint broadly enough to state a claim based upon a guaranty by Matra. Docutel asserts a claim against Matra based solely on its liability as a party to the subject contact and to the promises made in connection with the contract. The court therefore does not consider whether Docutel would have jurisdiction over Matra on a guaranty claim.

5. Docutel does not contend that DeGraaff had actual authority from Matra to enter into the subject contract, or that he exercised such authority when he exchanged telexes with Kirby. Accordingly, it has not made a prima facie showing of actual authority.

tions in Texas. Matra maintained continuous dealings with these corporations ending only upon Informatique's incorporation.

Matra's dealings with Docutel have been detailed above. They persisted after Informatique's incorporation in the form of the dispatch of invoices to Matra in February and May of 1977, and Matra's payment in Texas of $6894 on the February invoice. Further, DeGraaff's oral assurance to Kirby that Matra would "stand behind" Docutel's dealings with Informatique considerably influenced Docutel's willingness to conduct the negotiations which led to the subject contract.

Whether or not Matra's substantial but collateral contacts with Texas bring it within the Texas long-arm statute depends upon three questions: (1) whether the Texas Supreme Court would literally apply the *O'Brien* test on the facts of this case; (2) whether it would follow federal precedent and, if so, (3) whether jurisdiction exists over Matra on the facts of this case.

■ The Fifth Circuit follows the rule that *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1933) requires that a federal court, in a diversity case, give the long-arm statute of the state in which it sits the same construction as would the highest court of that state. *Eyerly Aircraft Co. v. Killian,* 414 F.2d 591, 598–99 n. 9 (5th Cir. 1969); *Walker v. Savell,* 335 F.2d 536, 540 (5th Cir. 1964). This court must therefore decide how the Texas Supreme Court would construe article 2031b in light of the facts of this case.

In *U–Anchor, supra,* the Texas Supreme Court cited both federal and Texas precedent and expressly followed the *O'Brien* test. It did not state, however, that the *O'Brien* test was the exclusive determinant of due process for purposes of article 2031b. The *O'Brien* test consists of a quotation from *Tyee Construction Co. v. Dulien Steel Products, Inc.,* 62 Wash.2d 106, 381 P.2d 245, 251 (1963), in which the Washington Supreme Court condensed the holdings of relevant U.S. Supreme Court cases into a three-part test for due process. In *O'Brien, supra,* the Texas Supreme Court construed

an Illinois long-arm statute and not article 2031b. Thus, Docutel's suggestion that the second element of the *O'Brien* test refers to the language of article 2031b, section 3, appointing the Secretary of State as agent for service of process for causes of action "arising out of" "business" done by the non-resident in Texas is not convincing. Rather, the *O'Brien* test is founded on another state's highest court's interpretation of pronouncements by the United States Supreme Court on the limitations of due process upon in personam jurisdiction originally adopted by the Texas Supreme Court to construe another state's long-arm statute.

Matra's counsel has cited no Texas case which holds that jurisdiction under article 2031b cannot exist if the non-resident defendant's contacts with Texas do not give rise to plaintiff's cause of action. The second requirement of the *O'Brien* test merely expresses a general rule for judging whether jurisdiction exists but does not encompass all fact situations. As courts often express, personal jurisdiction turns on the facts of each case. *See U–Anchor, supra,* 553 S.W.2d at 764; *Product Promotions, supra,* 495 F.2d at 499.

■ *U–Anchor, supra,* cannot be read to preclude a court from following federal precedent in determining due process for purposes of article 2031b. The Texas Supreme Court would not have stretched article 2031b "as far as the federal constitutional requirements of due process will permit" so as to avoid "technical and abstruse attempts to consistently define 'doing business' ", *U–Anchor, supra,* 553 S.W.2d at 762, only to substitute a "technical and abstruse" distinction between due process construed according to Texas precedent and due process construed according to federal precedent. The court notes that the two most recent decisions by the Fifth Circuit interpreting article 2031b after *U–Anchor* have cited federal precedent exclusively, failing to mention the *O'Brien* test. *Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir. 1978); *Walker v. Newgent,* 583 F.2d 163 (5th Cir. 1978). Since the

court is of the opinion that it may follow federal precedent in construing due process for purposes of article 2031b, it must now decide whether federal precedent permits the assertion of jurisdiction over Matra.

The United States Supreme Court, in *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), held that a court may assert jurisdiction over a non-resident defendant consistent with due process even if the defendant's contacts with the foreign state do not give rise to the plaintiff's cause of action. In *Perkins*, the defendant, a Phillipine Islands corporation, carried on continuous and systematic corporate activities in Illinois, the forum state, when World War II forced the relocation of its headquarters there. These continuous and systematic activities, in the court's opinion, made it just and reasonable to subject the defendant to a stockholder's suit brought in Illinois seeking damages for non-payment of dividends and non-issuance of stock certificates. *Shaffer v. Heitner*, 433 U.S. 198, 97 S.Ct. 2659, 53 L.Ed.2d 683 (1977), did not, as Matra contends, overrule *Perkins*. It merely brought "all assertions of state court jurisdiction," over actions in personam and in rem within the reasonableness standard of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny, which includes *Perkins*. *Shaffer, supra*, 433 U.S. at 212, 97 S.Ct. 2659.

The Fifth Circuit, in *Eyerly Aircraft Co. v. Killian*, 414 F.2d 591 (5th Cir. 1969), and *Jetco Electronics Industries v. Gardiner*, 473 F.2d 1228 (5th Cir. 1973), found that the non-resident defendants' "substantial and continuous" contacts with Texas, unrelated to the plaintiffs' causes of action, constituted independent bases for the assertion of jurisdiction over them. In neither case did the defendant's contacts with Texas approach the impact of Matra's contacts with Texas.

It is not unfair or unreasonable to require a corporation which over the course

of the seventies has purchased nearly $9,000,000 worth of goods manufactured and sold in Texas and has sent numerous representatives to the state to defend a suit brought in Texas. Matra has purposefully and vigorously exploited Texas markets. *See Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). By its continuous [6] and substantial activity in Texas, it has significantly entered the business life of Texas. *See Seymour v. Parke, Davis & Co.*, 423 F.2d 584 (1st Cir. 1970). The court, therefore, is of the opinion that the exercise of jurisdiction over Matra on the contract claim comports with due process, and accordingly, comes within the terms of article 2031b.

*Tort and Deceptive Trade Practices Claims*

This court may exercise jurisdiction over Matra on the tort and deceptive trade practices claims on the same basis that it may exercise jurisdiction over Matra on the contract claim.

Defendants' motion to dismiss, insofar as it asserts lack of personal jurisdiction, is denied. It is so ORDERED.

---

6. The court does not hold here that a corporation remains subject to suit in a state where it has maintained substantial business activities long after it has ceased those activities. The

court has found that Matra's contacts with Texas continued after Informatique's incorporation through the filing of this suit.