Ferdinand J. HEBERT

v.

KERR–McGEE CORPORATION, et al.

Civ. A. No. 83–0274.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Aug. 22, 1985.

Stephen R. Streete, Salter, Streete & Hale, Lake Charles, La., for plaintiff, Hebert.

Bert M. Cass, Eileen R. Madrid, Deutsch, Kerrigan & Stiles, New Orleans, La., for Kerr-McGee Corp.

W. Gerald Gaudet, Robert L. Ellender, Voorhies & Labbe, Lafayette, La., for Electrical & Instrumentation Unlimited, Inc.

Robert W. Clements, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, La., for Crain Bros., Inc.

A.R. Johnson, IV, Plauche, Smith & Nieset, Lake Charles, La., for CNA Ins. Co. and CE Natco.

## RULING

VERON, District Judge.

This matter comes before the Court on the motion of third-party defendant Electrical & Instrumentation Unlimited, Inc. [EIU] for partial summary judgment in its favor dismissing the portion of Kerr-McGee Corporation's third party complaint that seeks contractual indemnity from EIU. The plaintiff in this suit, Ferdinand Hebert, alleges that he was injured when he slipped and fell on an oily deck while employed by C–E Natco on an offshore platform owned and operated by Kerr-McGee on the Outer Continental Shelf off of the Texas coast. Hebert sued Kerr-McGee under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333. Kerr-McGee in turn third-partied EIU alleging that Hebert's claim was encompassed by an indemnity provision contained in a master service agreement between Kerr-McGee and EIU.

The master service agreement between EIU and Kerr-McGee is dated September 15, 1980. Paragraph 6 of the contract ob-ligates EIU to defend and indemnify Kerr-McGee against the various described claims "whether the same is caused or contributed to by the negligence of Kerr-McGee, its agents or employees." On March 27, 1981, Kerr-McGee issued a work order to EIU for an electrical installation job on Kerr-McGee's High Island Block 508–A platform. The plaintiff allegedly slipped on oil leaking from an EIU temporary generator while operations under the work order were still in progress, on January 24, 1982.

## I. ISSUES

In pursuing its motion, EIU contends that the indemnity agreement is invalid under the Louisiana Oilfield Anti-Indemnity Act, La.R.S. 9:2780, or, alternatively, if Louisiana law is not applicable, that Texas law applies to invalidate the agreement, under Tex.Civ.Stat.Ann. art. 2212b. Kerr-McGee in turn responds alternatively (1) that the state anti-indemnity statutes are inconsistent with controlling federal law and that they are therefore inapplicable under the Lands Act, (2) that, if Texas law is in fact applicable, the indemnity provision is enforceable to the extent that EIU has procured insurance pursuant to the master service agreement, and (3) that, if Louisiana law applies, that section 2780 is nonetheless inapplicable on the facts of this case. These varied alternative contentions all lead to one initial issue: Which body of law governs the contractual indemnity claim asserted in this case?

## II. CHOICE OF LAW

### Federal Law

■ The laws of the adjacent state are applicable on the Shelf "[t]o the extent that they are applicable and not inconsistent with [OCSLA] or with other Federal laws and regulations of the Secretary [of the Interior]." 43 U.S.C. § 1333(a)(2)(A). In *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), the Supreme Court held that, under the federal common law governing contracts entered into by the United States, an indemnitee is

permitted to recover for claims arising out of its own negligence. 397 U.S. at 209–17, 90 S.Ct. at 884–88. Kerr-McGee points to the inconsistency between the state anti-indemnity statutes and the rule permitting indemnity in *Seckinger* and urges that the statutes are therefore displaced under the Lands Act. This same contention is now being considered by a panel of the Fifth Circuit. *See Doucet v. Gulf Oil Corp.*, No. 84–3711 (5th Cir., argued July 10, 1985) (pending decision), *noted in* 2 Fifth Cir. Rep. 465 (1985). The Court will accordingly do little more than note its concurrence with the view that *Seckinger* is not itself applicable to purely private contracts on the Shelf and that, in any event, the phrase "other Federal laws" in section 1333(a)(2)(A) refers not to federal common law but instead to federal *statutory* law. *See Frazier v. Columbia Gas Development Corp.*, 596 F.Supp. 429, 430–31 (W.D. La.1984); *Greer v. Services Equipment and Engineering, Inc.*, 593 F.Supp. 1075, 1077–78 (E.D.Tex.1984); *see also* S.Rep. No. 411, 83d Cong., 1st Sess. 23 (1953), *quoted in Rodrigue v. Aetna Casualty and Surety Company*, 395 U.S. 352, 357–58, 89 S.Ct. 1835, 1838, 23 L.Ed.2d 360 (1969) ("Paragraph (2) adopts State law as Federal law, to be used when Federal *statutes* or regulations of the Secretary of the Interior are inapplicable.") (emphasis added); *cf. Rigby v. Tenneco Oil Co.*, 607 F.Supp. 1247 (E.D.La.1985) (the Longshoreman's Act does not bar application of section 2780 on the Shelf except where the 1984 amendments are applicable). The Court therefore holds that the rule enunciated in *Seckinger* does not displace an adja-

cent state anti-indemnity statute on the Shelf.

### Adjacent State Conflicts Law Under the Lands Act

The interests and contentions of the parties have shifted somewhat during the course of briefing and arguments on this motion. Initially, EIU urged that Texas conflicts law applied here in a fashion that mandated resort to Louisiana contractual indemnity law. As the arguments developed, however, it soon became apparent that this particular contention might better serve Kerr-McGee. The Louisiana Oilfield Anti-Indemnity Act might not apply to bar this particular indemnity claim because the specific work order involved here was issued prior to the statute's effective date.[1] Yet, regardless of these shifting interests, the preliminary issue remains before the Court of whether the Lands Act incorporates the choice-of-law principles of the adjacent state as surrogate federal law.

Broad language in a recent case by the Supreme Court and in another recent case by the Fifth Circuit indicates that the Lands Act supersedes normal choice-of-law rules such that the adjacent state's law of contractual indemnity automatically governs indemnity provisions applicable on the Shelf. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 482 n. 8, 101 S.Ct. 2870, 2877 n. 8, 69 L.Ed.2d 784 (1981); *Mills v. Zapata Drilling Co.*, 722 F.2d 1170, 1174 (5th Cir.1983). Yet in neither case was the issue squarely presented of whether the Lands Act carries the adjacent

---

1. It is settled law that the Act is not applicable to an indemnity claim under a master service contract where the alleged injury occurs before September 11, 1981. *See Smith v. Shell Oil Co.*, 746 F.2d 1087, 1093–94 (5th Cir.1984); *Tobin v. Gulf Oil Corp.*, 535 F.Supp. 116, 117 (E.D.La. 1982); *Great Atlantic Ins. v. Martin Services International*, 445 So.2d 146, 148–49 (La.App. 3d Cir.1984). Also well-established is the rule that the Act does apply to indemnity claims under master service contracts where both the issuance of the specific work order and the alleged injury occur after September 11, 1981. *See Rigby v. Tenneco Oil Co.*, 607 F.Supp. 1247, 1248 (E.D.La.1985); *Durant v. Chevron U.S.A.,*

*Inc.*, 594 F.Supp. 527, 535–36 (E.D.La.1984); *Aucoin v. Pelham Marine, Inc.*, 593 F.Supp. 770, 775–76 (W.D.La.1984); *Home Insurance Co. v. Garber Industries, Inc.*, 588 F.Supp. 1218, 1221–22 & n. 6 (W.D.La.1984); *see also Livings v. Service Truck Lines of Tex., Inc.*, 467 So.2d 595 (La.App. 3d Cir.1985) (the court adopts Judge Shaw's reasoning in the *Garber* case and applies the Act to 1971 and 1979 master service contracts, but does not specify the date of either the alleged injury or the issuance of the work order). The question of whether section 2780 applies to claims under pre-Act work orders for alleged injuries that occur after the effective date of the Act is unresolved, however.

state's choice of law rules out on to the Shelf where those rules merely apply state law that otherwise would govern if the action in fact had arisen within the adjacent state. That precise issue has been raised in this case. The analysis of the question necessarily begins with the Supreme Court's decision in *Chevron Oil Company v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

In *Chevron,* the Supreme Court held that Louisiana's one-year prescriptive period, rather than the maritime doctrine of laches, applied to a personal injury action arising on a platform on the Shelf off the Louisiana coast. The court of appeals below had applied maritime law on the theory that, under Louisiana conflicts law, the one-year prescriptive period contained in former article 3536 was not binding outside of a Louisiana forum and that, hence, article 3536 was not applicable in a federal forum hearing a Lands Act case. *See Chevron,* 404 U.S. at 101–02, 92 S.Ct. at 353. In reversing this decision, the *Chevron* Court observed:

> [A] federal court applying Louisiana law under § 1333(a)(2) of the Lands Act is applying it as federal law—as the law of the federal forum. Since the federal court is not, then, applying the law of *another* forum in the usual sense, ordinary conflict of laws principles have no relevance. Article 3536 is "applicable" in federal court under the Lands Act just as it would be applicable in a Louisiana court.

404 U.S. at 102–03, 92 S.Ct. at 353 (emphasis in original). As this Court reads this language, *Chevron* does not prohibit resort to conflicts principles of the adjacent state in a Lands Act case. Instead, *Chevron* proceeds from the fundamental premise that adjacent state law applies as the law *of* the federal forum and demonstrates that, accordingly, the federal forum must be viewed as the local, rather than a foreign, forum when the adjacent state's con-

flicts principles are applied as surrogate federal law. That is, the error of the lower court lay not in the fact that it applied Louisiana choice of law principles, but in the fact that the court effectively treated the federal Lands Act forum as a foreign forum when it applied those principles as the surrogate law of that forum. Repetition of this error is all that *Chevron* prohibits. The decision does not bar, and is entirely consistent with, application of adjacent state conflicts law on the Shelf, so long as the Lands Act forum is treated as the local forum for purposes of the conflicts analysis.

This reading of *Chevron* is consistent with the law in other contexts in which state law is adopted as surrogate federal law. For example, the Federal Tort Claims Act provides for adoption of "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). In *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), the Supreme Court reviewed this provision and held that the Tort Claims Act requires application of the whole law of the State where the act or omission occurred, including its conflicts law. 369 U.S. at 11, 82 S.Ct. at 592. Indeed, the *Chevron* court itself addressed this decision, remarking that "[i]nsofar as *Richards* bears on the present case, it supports our holding that federal courts should not create interstitial federal common law when the Congress has directed that a whole body of state law shall apply." 404 U.S. 105 n. 8, 92 S.Ct. 345 n. 8. Significantly, this comment proceeds on the assumption that the Lands Act, like the Tort Claims Act, refers to the *whole* body of state law. The passage further emphasizes the point that the concern in *Chevron* was not with the application of adjacent state conflicts rules *per se,* but rather with the use of those rules to apply federal common law principles that would not otherwise be applicable if the cause of action had arisen within the adjacent state.[2]

**2.** *See also Chevron,* 404 U.S. at 103–04, 104–05, 92 S.Ct. at 354:

The Court of Appeals acknowledged that *Rodrigue* forecloses direct applicability of the "inconsistent" laches doctrine through admi-

Thus, the *Chevron* decision not only does not prohibit resort to adjacent state conflicts principles in a Lands Act case, but, instead, *Chevron* goes further and indicates that a decision not to apply this facet of the adjacent state's law would contravene the Congressional directive.

Construing the Lands Act to permit resort to the adjacent state's conflicts law certainly requires no tortured construction of the statutory language. Section 1333(a)(2)(A) states simply that, where applicable and not inconsistent with other Federal law, "the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for ... artificial islands and fixed structures erected" on the Shelf. Looking solely on the face of the statute, the phrase "civil ... laws" can surely encompass a state's civil laws concerning choice of law in contract actions.

■ Nor does construing the Act in this manner conflict with the underlying purposes evidenced in its legislative history. The prime motivating factor in Congress' decision to adopt adjacent state law as surrogate federal law was the perceived undesirability of application of federal admiralty law to Shelf structures. *See Rodrigue*, 395 U.S. at 361–66, 89 S.Ct. at 1840–42 (discussion of this aspect of the legislative history). The legislative history nowise indicates that Congress was concerned with application of the law of other states through the choice of law principles of the adjacent state. Congress *was* concerned with "the special relationship between the men working on these artificial islands and the adjacent shore to which they commute to visit their families." 395 U.S. at 365, 89 S.Ct. at 1842. Yet application of the adjacent state's conflicts law on the Shelf does not in any way compromise this interest. So long as the Lands Act forum is regarded as the local forum in the conflicts analysis, the same law will apply to the injured worker's claim that would apply if he were injured in the adjacent state.[3]

■ Accordingly; pursuant to the foregoing review of the jurisprudence, the statutory language and the relevant legislative history, the Court concludes that the Outer Continental Shelf Lands Act, and in partic-

---

ralty law. But, by applying laches as a matter of federal common law, it sought to reintroduce the doctrine through a back door. This approach subverts the congressional intent documented in *Rodrigue, id.* [395 U.S.]. at 359–66, 89 S.Ct., at 1839–42, that admiralty doctrines should *not* apply under the Lands Act.

... Congress made clear provision for filling in the "gaps" in federal law; it did not intend that federal courts fill in those "gaps" themselves by creating new federal common law. (emphasis in original) (footnote deleted).

**3.** In its *Chevron* opinion, the Supreme Court stated that its directive that Louisiana Civil Code article 3536 apply on the Shelf "is not to imply that a federal court adjudicating a claim under state law as absorbed in the Lands Act must function as it would in a diversity case." 404 U.S. at 103 n. 5, 92 S.Ct. at 353 n. 5. This Court's holding on EIU's motion similarly does not imply that a federal court must function as it would in a diversity case in hearing a Lands Act case. In a diversity case, the district court applies the choice of law rules of the forum state, i.e., the state in which it sits, when the action is brought originally in that district

court. *E.g., Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Davis v. National Gypsum Co.,* 743 F.2d 1132, 1133 (5th Cir.1984). In a federal Lands Act case, the district court applies the choice of law rules of the state adjacent to the portion of the Shelf where the claim arose, *regardless of whether that state is the state in which the court sits.* The basic facts of the instant case provide a ready example of how this distinction operates. If this claim had arisen under Texas law and had been brought here solely on diversity of citizenship, then the Court would have looked to the law of Louisiana, the forum state, in order to determine which body of law applied to the indemnity claim. But as the claim arises under the Lands Act and as it is therefore here under the Court's federal question jurisdiction, the Court must look to the law of Texas, the state that is adjacent to the portion of the Shelf involved, for the choice of law rules. The choice-of-rules law of the forum state, Louisiana, which would have been controlling had this been a diversity case, are completely irrelevant in this regard. Thus, the method for choosing the applicable choice-of-law rules in a Lands Act case is functionally distinct from the method employed in a diversity case.

ular 43 U.S.C. § 1333(a)(2)(A), incorporates the conflicts-of-law rules of the adjacent state as surrogate federal law in cases arising on the Shelf, subject to the reservation under *Chevron* that the Lands Act forum must be treated as the local forum for purposes of the conflicts analysis.[4] The Court will now turn to the question of how the conflicts law of the adjacent state, Texas, operates in this case.

### Application of Texas Conflicts Principles

If an action similar to this one were to arise shoreside in Texas, the basic contractual choice-of-law scheme could be stated in fairly simple terms. At the outset, in the absence of a contrary manifestation, the initial presumption is that the parties intend for the law of the jurisdiction where the contract is made to govern. *E.g., Lockwood Corp. v. Black*, 669 F.2d 324, 327 (5th Cir.1982). Where a contract made in one jurisdiction is to be performed entirely in another jurisdiction, however, the law of the place of performance governs. *E.g., Teas v. Kimball*, 257 F.2d 817, 823 (5th Cir.1958); *Docutel Corporation v. S.A. Matra*, 464 F.Supp. 1209, 1215 (N.D.Tex. 1979). Yet the initial presumption that the law of the place of execution governs is again controlling if the contract is to be performed in more than one place. *E.g., Associated Press v. Berger*, 460 F.Supp. 1003, 1006 (W.D.Tex.1978); *see also Restatement (Second) of Conflict of Laws*, Section 188, comment (e) (1971) (the place of performance bears little weight under the significant relationship test when the place of performance is uncertain or unknown at the time of contracting or when performance is spread across two or more jurisdictions with varying rules of law on a particular issue).

Although the background conflicts principles are easily stated, the question of how those principles apply in the instant case is not as easily resolved. A critical issue arises as to whether these fundamental principles should be applied to the master service agreement, or instead to the specific work order for the electrical work on the Texas Shelf platform. If the master service contract is the relevant agreement, then Louisiana substantive law would probably apply to the indemnity claim presented here. No particular location for performance of services was contemplated when the parties executed the blanket agreement. Thomas Stokes dep. at 16. EIU may well have performed services under the agreement on platforms governed by Louisiana law in addition to platforms, such as the one in the instant case, that are governed by Texas law. *Id.* at 14. As the place of performance was unspecified and was in fact spread across the two jurisdictions, Texas conflicts law would point to application of the law where the agreement was executed. The negotiations leading up to this master service agreement were all conducted in Louisiana and the signatures required to execute the agreement were all affixed in Louisiana. Under Texas law, the agreement was therefore made in Louisiana. *See, e.g., Diaz v. Southeastern Drilling Co.*, 324 F.Supp. 1, 4 (N.D.Tex.1969). Thus, if the master service agreement is the relevant agreement for the Texas conflicts analysis, then the law of Louisiana, rather than Texas, would most likely govern Kerr-McGee's claim for contractual indemnity. If, on the other hand, the work order is the relevant contract, then Texas substantive law will apply because the work order was to be performed wholly in a jurisdiction governed by Texas law. Thus, the Court must determine which contract is the relevant contract for the Texas conflicts analysis.

■ The specific work order issued for the electrical installation work on the Texas Shelf platform constitutes the relevant contract for the contractual choice-of-law analysis. As this Court has noted in a related context, a master service agreement does not itself bind the parties to perform any services. It merely sets forth their agree-

---

**4.** The Court respectfully disagrees with, and declines to follow, the contrary holding in *Greer,* 593 F.Supp. at 1078–79, for the reasons assigned in the text.

ment to abide by certain terms should they contract to perform services in the future. *Moser v. Aminoil, U.S.A., Inc.,* 618 F.Supp. 774, 779 (W.D.La.1985). Each work order issued that incorporates the terms of the blanket agreement is therefore a separate and independent contract. *Accord Credeur v. Union Oil Company,* No. 82–0275, (W.D.La., June 27, 1983) (reprinted as an appendix to *Moser*). As each work order initiates a distinct contractual enterprise which merely incorporates the terms of the master service agreement by reference, the work order stands as the most appropriate contract for the choice-of-law analysis.

Keying the conflicts analysis to the work order rather than the master service agreement is particularly appropriate on the facts of this case. The parties executed the master service agreement here in 1980, over seven years after the passage of the Texas statute barring indemnification against an indemnitee's negligence in oilfield contracts. To resort to the master service agreement as the relevant contract for the conflicts analysis here would effectively permit the parties to avoid controlling Texas law on the point by merely incorporating terms from a contract executed in another jurisdiction into a separate

and independent contract that is to be performed wholly in a jurisdiction governed by Texas law. Parties should not be permitted to avoid the law of one jurisdiction by executing in another jurisdiction a blanket agreement that specifies the terms of distinct contracts that they may subsequently perform wholly in the first jurisdiction. *Cf. Moser,* 618 F.Supp. at 779 n. 2 (parties to work orders cannot avoid changes in the law by resort to blanket service agreements).[5]

Thus, for the foregoing reasons, the Court concludes that Texas conflicts principles direct the application of Texas internal law to the indemnity claim presented here.

## III. ARTICLE 2212b

■ Kerr-McGee does not dispute that, absent some statutory exception, Section 2 of the Texas statute pertaining to oilfield indemnity, Tex.Civ.Stat.Ann. art. 2212b will bar its indemnity claim. Instead, Kerr-McGee relies upon the exception contained in section 4(c) of the Act, which provides:

(c) The provisions of Section 2 of this Act shall not apply to any agreement providing for indemnity with respect to claims for personal injury or death to indemnitor's employees or agents, or the employees or agents of indemnitor's sub-con-

---

5. The approach to the choice of law question presented here is compatible with Texas case law. In *Grace v. Orkin Exterminating Co., Inc.,* 255 S.W.2d 279 (Tex.Civ.App.—Beaumont 1953, writ ref'd n.r.e.), the plaintiff sought to enforce a covenant not to compete contained in an employment contract with its former employee. The restrictive covenant was valid in Texas but was invalid in Louisiana. The former employee had served as a manager over a district encompassing eight separate units, six of which were in Texas and two of which were in Louisiana. On these facts, the *Grace* court found that the operation and performance of the contract in Texas was severable from the operation of the contract in Louisiana. 255 S.W.2d at 295, 296–97. The court therefore applied the Texas law permitting the covenants to the Texas units of the management district.

Similarly, even if the master service contract is initially resorted to as the relevant contract for the conflicts analysis, the operations under the March 27, 1981 work order can be easily severed from other operations subject to the master service agreement. As the parties have

not manifested a contrary intent, Texas law therefore can apply to these particular operations even though operations subject to the Louisiana-executed master service contract are also pursued in other jurisdictions. This refinement in the choice of law analysis under *Grace* is also consonant with other federal decisions which look to the precise contractual obligation involved in determining the law applied to the subsidiary indemnity obligation. *Cf. O'Dell v. North River Ins. Co.,* 614 F.Supp. 1556 (W.D. La.1985) (the district court applied maritime law to an indemnity obligation arising out of catering services that were provided to a vessel subject to a master service contract that contemplated performance on land drilling rigs, special purpose vessels, and fixed offshore platforms); *Hale v. Co-Mar Offshore Corp.,* 588 F.Supp. 1212 (W.D.La.1984) (the district court applied maritime law to an indemnity claim under a provision in a platform drilling contract where the injured employee was engaged in providing separable maritime services contemplated by the drilling contract.

tractors if the parties agree in writing that such indemnity obligation will be supported by available liability insurance coverage to be furnished by indemnitor, . provided, however, that such indemnity obligation shall be only to the extent of the coverages and dollar limits of insurance agreed to be furnished; but in no event shall said insurance be required in an amount in excess of twelve times state basic limits for bodily injury, approved by the Board of Insurance Commissioners in accordance with Article 5.15 of the Texas Insurance Code.

Yet EIU has established in response that Hebert was an employee of CE Natco, which is a subcontractor not of the indemnitor, EIU, but rather of the indemnitee, Kerr-McGee. The exception in section 4(c) is therefore inapplicable because the instant claim does not fall within the ambit of "claims for personal injury ... to *indemnitor's* employees or agents, or the employees or agents of *indemnitor's* subcontractors." Thus article 2212b applies to bar Kerr-McGee's claim for contractual indemnity.

Accordingly, the motion of third party defendant Electrical & Instrumentation Unlimited, Inc. for partial summary judgment in its favor dismissing the third-party demand of third-party plaintiff Kerr-McGee Corporation for contractual indemnity is GRANTED.